## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| **TERRY VANOVER,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Action No.:** 5:23-cv-00802 |
| | * | **Honorable** |
| **STATE FARM MUTUAL** | * | |
| **AUTOMOBILE INSURANCE** | * | |
| **COMPANY and** | * | |
| **BODYSHOPBIDS, INC.,** | * | |
| **d/b/a SNAPSHEET, INC.,** | * | |
| | * | |
| **Defendants.** | * | |

---

## COMPLAINT

---

Plaintiff Terry Vanover states as follows for her *Complaint* against the Defendants State Farm Mutual Automobile Insurance Company and Bodyshopbids, Inc., d/b/a Snapsheet, Inc.:

1.      Plaintiff Terry Vanover is, and at all times relevant herein was, a resident and citizen of Wyoming County, West Virginia.

2.      Defendant State Farm Mutual Automobile Insurance Company ("State Farm") is an insurance company chartered in Illinois and with a principal place of business at One State Farm Plaza, Bloomington, Illinois 61710.  At all relevant times, State Farm was authorized to do business as an insurer in the State of West Virginia by the West Virginia Offices of the Insurance Commissioner ("WVOIC") subject to compliance with West Virginia laws and regulations on the provision of insurance products.

3.      Defendant Bodyshopbids, Inc. d/b/a Snapsheet, Inc. ("Snapsheet") is a Delaware corporation with its principal place of business located in Illinois.  At all relevant times, Snapsheet provided a service designed to reduce losses ("claim payment") for insurance companies via its

claims software.  At all relevant times, Snapsheet was funded, in part, by State Farm Ventures, LLC, which is, upon information and belief, a wholly-owned subsidiary of State Farm.

## JURISDICTION and VENUE

4.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1332 in that the amount in controversy exceeds $75,000.00, exclusive of costs and interest, and involves citizens of different states.

5.      Defendants availed themselves to the jurisdiction of this Court pursuant to W. Va. Code § 56-3-33 and W. Va. Code § 31D-15-1501(d)(3), by doing, personally and through its agents, the following acts:

    a.    Committing tortious acts within this state by engaging in bad faith provision of insurance services in West Virginia via claims-management software designed to artificially reduce claim values;

    b.    By selling, distributing, assembling and/or servicing its products in West Virginia with the purpose of exploiting the West Virginia insurance market;

    c.    By deriving substantial revenues in this state;

    d.    The acts or omissions of the Defendants caused injuries to persons in West Virginia, including Ms. Vanover; and,

    e.    By engaging in the solicitation of activities in West Virginia to promote the sale, consumption, use, maintenance and distribution of Defendants' insurance and claims-management products.

6.      Venue is proper in the United States District Court for the Southern District of West Virginia pursuant to 28 U.S.C. § 1391(a) as a substantial portion of the events giving rise to the claims herein took place in Wyoming County, West Virginia, which is within the judicial district of this Court.

**THE AGREEMENT TO INSURE THE STATE FARM POLICYHOLDER**

7.      State Farm has been continuously registered as an insurance company conducting business in West Virginia since 1929.  Among other products, State Farm provides homeowners, auto and recreational vehicle ("RV") insurance products.

8.      Plaintiff Terry Vanover entered into a contractual agreement with Defendant State Farm Mutual Automobile Insurance Company and paid valuable consideration for an insurance policy.  Specifically, Ms. Vanover purchased State Farm Recreational Vehicle Policy No. 148138348 (the "State Farm Policy"), which provided coverage for her 2014 Keystone Mountaineer RV, VIN # 4YDF34526E4730009 (the "RV").

9.      The State Farm Policy states: "Insuring Agreement We will pay for loss to a covered vehicle."  Loss under the State Farm Policy means "direct, sudden, and accidental damage to … a covered vehicle."

10.     The State Farm Policy further states "Covered Vehicle means … your recreational vehicle."  The State Farm Policy then provides that State Farm "will pay . . . damages an insured becomes legally liable to pay because of: . . . damage to property caused by an accident that involves a vehicle for which that insured is provided . . . Coverage by this policy."

11.     State Farm's "First Party Coverage Seminar", which serves as training materials for State Farm adjusters handling auto claims, including claims under recreational vehicle policies, identifies and discusses many good faith obligations and industry standards for claim handling. This seminar contains a major focus on uninsured/underinsured motorist claims. Listed within the seminar are the following points:

> (a)     An insurer should make a reasonable attempt to effectuate prompt, fair and equitable settlements of claims whenever coverage, liability, and damages have become reasonably clear.

(b)    An insurer should not delay resolution of a claim by requiring an insured to produce information which the insurer already has or can reasonably obtain.

(c)    An insurer has an implied duty to resolve a claim once it has acquired enough evidence and information to establish the validity of a claim.

(d)    An insurer is required to pursue resolution of insured's claims with reasonable diligence.

(e)    Claim investigations should be objective and designed to acquire information that is reasonably related to the claim.

(f)    When necessary for claim resolution, an insurer should select objective experts to assist the insurer in making claim decisions.

(g)    Insurers have a duty to disclose policy terms, conditions, and obligations to insureds.

(h)    The insured may not be required to produce information the insurer already has, or can reasonably obtain.

(i)    An insured should be provided an opportunity to explain discrepancies, or to challenge information that we relied upon when making coverage, liability, and/or damage decisions. Insureds should be advised of our willingness to reconsider our position if new information becomes available. (Assuming the claim or part of the claim was reduced or denied.)

12.    State Farm gives every claim handler a document that lays out the basis of good faith claim handling at State Farm.  This document, "Our Commitment to Our Policyholders" includes, in part, the promise to:

(a)    Listen, be fair, be open, and carry out our part of the bargain under the contract in good faith.

(b)    Be familiar and in compliance with those laws and regulations that impact claims to the appropriate state, and treat policyholders consistent with requirements of the law.

(c)    Explain all relevant coverages under the policy.  Encourage policyholders to report all losses and avail themselves of all benefits under their coverages.

(d)    Diligently investigate the facts to determine if a claim is valid, reasonably evaluate the claim, and act promptly in resolving the claim.  If it necessary to

reject a claim for coverage or damages, it should be done promptly and courteously, with an explanation for the decision.

(e)   Make an objective evaluation of the facts and circumstances supporting our policyholders' claims.  Doing so helps ensure our policyholders obtain all benefits available provided by the insurance policy.

(f)   Give insureds a reasonable opportunity to comply with their responsibilities under the policy.  If a claim is rejected, be willing to listen to subsequent input from the insured.  Complete any necessary follow up in a timely fashion, giving due consideration to any additional findings.

13.    In the Winter 2007 Claims Quarterly Magazine, State Farm's Vice President of Claims Susan Hood discussed "Our Commitment To Our Policyholders" and State Farm's obligations to their policyholders.  She stated:

> Since the mid-1990s, Our Commitment to Our Policyholders has been the written foundation for how we handle claims at State Farm'". It's something we've always practiced, but putting Our Commitment in writing gave us an opportunity to articulate our claim-handling philosophy and what we in Claims do.
>
> Our policyholders place their trust in State Farm when they purchase insurance from us, and when they have a claim, we take pride in keeping our promise to them to pay what we owe, promptly, courteously, and efficiently.
> Our Commitment is about our responsibilities in Claims. It's about how we treat our customers. It's about providing the best claim service in the industry. And above all, it's always all about our policyholders. Everything starts and ends with them.
>
> **Compliance.**
> We must comply with the laws and regulations under which we operate.
>
> **Explaining coverages.**
> It's such an important part of our job in Claims to explain to our policyholders all coverages available to them. This can be complex sometimes, but we must take time to thoroughly review the policy and circumstances of the loss in order to ensure our policyholders receive the full benefits of their coverages according to the terms of their policy. This is just the right thing to do. When a claim is not covered, we must promptly and courteously explain why.

**Investigation and evaluation.**
Thorough investigation, evaluation, and timely resolution of a claim also are critical parts of what we do. By knowing the facts of the loss and understanding the terms of the policy, we are able to make sure our customers receive the benefits available to them. Our evaluations must be objective, and each claim must be evaluated on its own merits.

**Due consideration.**
We must be willing to listen to input from our policyholders and thoroughly review any additional information they may present. It is important that we carefully consider all information available in our evaluation and investigation of a claim.

14.    State Farm knows that undermining first party policy benefits carry the risk of increasing the insured's emotional and financial distress.  With such knowledge, the public should expect an insurer to implement and enforce claim principles to carry out the policy's purposes with a high degree of skill, supervision, and concern for the insured.

## BEHIND THE CURTAIN

15.    State Farm's goal is to be the "most profitable claim service in the industry."

16.    To achieve this objective, State Farm put into effect various programs in its claims operation aimed at improving company profitability.  These programs included State Farm's Achieving Claims Excellence ("ACE") program, employee evaluations or PP&Rs, and bonus programs directed at providing financial incentives to claims department employees to increase State Farm's profits.

**The ACE Program.**

17.    State Farm inaugurated its ACE program in 1994 with the assistance of McKinsey & Co., a private consulting firm.  The purpose of the program was to improve State Farm's profitability by artificially reducing claim payments (or, as State Farm would word it, "identify

areas within the claim handling process where missed profit could be recovered and where customer service could be improved.").

18.    Notably, State Farm identified areas of "missed profit" at different times as shortfall, slippage, leakage, and quality differential.  The term "shortfall" in particular referred to losses in the form of indemnity payouts and expense costs.

19.    By January 1996, State Farm's "Action" publication (Vol. 27, No. 1) reported under the heading "A Stitch in Time: Cost Saving Solutions for the '90s" that "ACE has the potential of taking a billion dollars of cost out of our system every year."

20.    The goals of ACE were set out in several other publications, which were distributed company wide:

(a)    In the November 1996 State Farm publication, "Operation Understanding," it was reported that a State Farm goal is "future proofing" State Farm by "cutting $2 billion dollars from operating costs."

(b)    State Farm's ACE presentation outline contained the following: Considerable opportunity exists in the area of loss pay out. 69 cents of each premium dollar is used to pay losses. Better management of payouts will improve the rates we charge and make us more efficient.

(c)    A goal of State Farm 2000 is to achieve a $2 billion savings in expenses by the year 2000. If ACE determines that there is a 12% claims payment shortfall nationwide…and we are able to reduce the shortfall to 10%, we have recovered the $2 billion savings in expenses.

(d)    In another State Farm publication it was reported that the "objective of the ACE program is to identify opportunities to build on the existing strengths of the Northeastern Region, to improve auto claims performance, and to lead to sustained profitability."

21.    State Farm's goal of increasing its profitability through ACE was to be achieved by reducing claims payments.  As one State Farm publication noted: "Indemnity payout represents the single largest opportunity for improvement."

22.     In a State Farm document entitled, "Discussion Document - Region," it was noted that an objective of the "ACE Assessment October '96 to January '97," was to "[d]etermine the impact of ACE to date on both behavior and bottom-line results," and that the quantitative review of six State Farm regions would include "[p]rofitability." This document goes on to describe State Farm's achievement in reducing paid loss per policy as compared to the rest of the insurance industry.

23.     This, in effect, is but another way to measure claims performance based on reducing average paid claim payouts.

24.     The process at State Farm was accomplished through a closed file review conducted by personnel that were "calibrated" based on how a top quartile claim handler should have handled the claim file. Closed files were used in order to quantify the difference between what was paid and what could have been paid to settle the claim. This could only be accomplished by using paid and closed claims. Employees and customers were both interviewed.

25.     The initial file review developed an estimate of lost profit (shortfall) based on current claim handling practices and potential future savings by improved claim handling practices. Based on the review, each region developed certain "initiatives" directed at changing how claims were handled. As the initiatives were implemented, further file reviews were conducted to measure their effect. These initiatives were adjusted, discarded or reengineered as necessary to achieve the desired results.

26.     While the terminology may be different, it is the same McKinsey methodology utilized at State Farm today. State Farm continues to utilize this same methodology today, it involves the use of Closed File Reviews, the use of "calibrated" survey teams to identify the amount of supposed shortfall/opportunity/leakage, followed by the design and implementation of

claim evaluation systems, initiatives, or programs designed to generate "standardized" or "calibrated" claim handling and settlement values with the goal of increasing profits through lower claim payments. Finally, accountability through an employee evaluation system which measures and rewards claim handling behaviors directly linked to reducing claim payment to increase corporate profit (i.e., bottom line results).

27.     A good example of this as it relates to the McKinsey methodology is found in State Farm ACE documents dealing with terms and "wordsmithing." These documents show that State Farm changed ACE terminology to less threatening and less accurate terms.  "Shortfall," which clearly denotes overpayments that are considered negatives to profit, is changed to "Quality Difference."  "Calibration," which by definition is the process of checking against an accurate standard to determine any deviation and correct for errors, to "Consensus Building," which has nothing in common with "calibration."  "Top Quartile," which is an unachievable standard which results in a gross overestimate of "shortfall," was changed to "Best Practices," a standard everyone can relate to, but not accurate as it relates to the McKinsey methodology.  These changes are made to soften the impression, but are totally inaccurate representations of State Farm's intentions and goals.  These changes are deceptive, but very effective.

**State Farm's History of Misconduct in Auto Property Damage Claims.**

28.     State Farm has an extensive history of misconduct in relation to automobile property damage claims.

29.     Michael E. Avery, et al., on behalf of themselves and all others similarly situated, filed a class action lawsuit against State Farm Mutual Automobile Insurance Company in Williamson County, Illinois and secured a $1.18 billion dollar judgment as a result of State Farm's breach of contract, consumer fraud, and other claims, including a punitive damages claim.

30.     The *Avery* class action alleged that State Farm had deceived policyholders by specifying the use of non-OEM parts for collision repairs and breached its contract with the plaintiff class.

31.     Thereafter, a Class Action Complaint styled *Hale v. State Farm Mutual Automobile Insurance Company* was filed in the United States District Court for the Southern District of Illinois.  The *Hale* Complaint alleged that State Farm violated the RICO statute in an attempt to overturn, in the Illinois Supreme Court, the $1.05 billion dollar judgment in *Avery v. State Farm Mutual Automobile Insurance Company* in favor of approximately 4.7 million State Farm policyholders, which would allow State Farm to avoid paying the amount of the judgment rendered in plaintiffs' favor in the trial court.

32.     The *Hale* class action sought damages against Defendants for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq. In their Second Amended Class Action Complaint, the Hale Plaintiffs added a claim for unjust enrichment. The class action resolved for $250 million.

33.     These examples demonstrate State Farm's pattern of artificially reducing payments for total loss claims by applying an arbitrary "typical negotiation" adjustment to the values of comparable vehicles.  Using vendors such as Snapsheet, State Farm artificially suppresses the actual cash value ("ACV") of a total loss vehicle by reducing ACV by an arbitrary and unsupportable four to eleven percent, which it claims is representative of average differences between list price and sale value.

34.     Then, State Farm relies on appraisal provisions in their policies which require an insured to secure their own appraisal, at their own expense, if there is a disagreement as to ACV (sometimes referred to as an "original estimate" versus a "supplemental estimate").  This integral

component of the scheme often forces policyholders to accept reduced ACV payments from State Farm because either (1) the appraisal cost exceeds the potential increase in ACV; or, (2) the policyholder lacks the means to combat State Farm's arbitrary reduction in ACV.

35.    In sum, State Farm directs its third-party valuation vendor to "systematically" reduce the value of comparable vehicles listed for sale in the relevant market by applying a blanket adjustment to the cars' selling prices, which in turn reduces the actual cash value of the totaled car. As a result, insureds are regularly underpaid for total loss claims.

36.    On top of this gross misconduct, State Farm has historically trained its adjusters to only value auto property damage that is visible to the naked eye.  For example, Andrew Bowers, who worked as a State Farm adjuster from 1973 until he retired in 1998, was trained not to open anything to look for damage and was not to include anything on an estimate that he could not see, even if he knew there was damage.

37.    Between its directives to its adjusters and its utilization of systemic vendor claims management software designed to lowball claims, State Farm operates a systematic and fraudulent scheme to miscalculate the vehicles' value in a manner that does not align with its contractual obligations in order to illegally increase its own profits.  As a result of State Farm's estimating procedures, its estimates are always underwritten.

38.    State Farm CEO Michael Tipsord revealed that, in 2022, State Farm recorded $13 billion dollars in underwriting loss, the largest in its 100-year history.  The loss relates primarily to State Farm's auto insurance companies, which—while reporting earned premium of $45.7 billion— incurred claims and loss adjustment expenses of $48.4 billion and other underwriting expenses of $10.8 billion resulted in the captive's highest-ever underwriting loss.  As a result, State

Farm is even more incentivized to underpay claims; specifically, by aggressively utilizing vendor claims management software as a means of recovering "missed profit."

## STATE FARM AND SNAPSHEET

39.    Sometime prior to October 2022, State Farm began utilizing claims-management software and services provided by Snapsheet.  Again, State Farm was also an active investor in Snapsheet through its investment subsidiary, State Farm Ventures, LLC.

40.    As such, State Farm has a financial interest in Snapsheet's success and in Snapsheet's mission to help insurers—including itself—reduce loss to increase revenue.

41.    For its part, Snapsheet was founded with no connections whatsoever to the insurance industry; however, co-founded CJ Przybyl managed to obtain a meeting with the Chief Financial Officer of "one of the largest insurance carriers in the country."

42.    During that meeting, Snapsheet founders deliberately presented screenshots of a non-functional application for claims-management as being fully functional to secure a contract and/or investment.

43.    Snapsheet then relied on a belief that "contracting would take at least three months" and elected to "build a working product" during that time period "which became the foundation of what Snapsheet is today."

44.    From the very beginning, Snapsheet was built on deception and a rushed product designed solely to increase insurance company revenue by reducing claim payment.

45.    Today, Snapsheet routinely acknowledges that its claim adjustment software is aimed at  reducing the amount of money insurance companies pay to first party claimants by indicating that it will "reduce loss!" and claiming a "20% reduction in claims leakage."

46.     State Farm's use of Snapsheet negligently, carelessly and recklessly undervalues auto property damage claims because Snapsheet's photo adjustment is incapable of determining damages that are invisible to the naked eye such (e.g., damage to component parts, frame damage and/or malalignment), notably consistent with the directives provided to State Farm adjusters.

## THE FIRST PARTY INSURANCE CLAIM

47.     For approximately 40 years prior to October 2022, Ms. Vanover was a loyal customer of State Farm who believed State Farm, "like a good neighbor", would be there for her in her time of need.

48.     On or about October 1, 2022, that need arose.  Ms. Vanover and her significant other, Donald Lambert, were driving home from their annual fall vacation at the Stonewall Resort.

49.     The annual trips to Stonewall were cherished by Ms. Vanover and Mr. Lambert, who were both treating for cancer at the time via chemotherapy.

50.     Ms. Vanover and Mr. Lambert stayed in one of Stonewall's campsite lots using their RV.

51.     At all relevant times, the RV was insured through the State Farm Policy. At all relevant times, the Policy's premiums were paid and the Policy was current.

52.     On the way home, the RV struck a pothole in the road.  Mr. Lambert heard a loud crack.

53.     On inspection back in Clear Fork, Mr. Lambert came to the conclusion that there was damage to the tongue assembly of the RV, which is the component of the RV that allows it to hitch for transport.

54.     Mr. Lambert reached this conclusion, in part, by slowly lowering the RV as though he were going to transport it.

55.     When the weight of the RV was lowered onto the tongue assembly, the assembly buckled up into the frame of the RV, manifesting in a bowing effect on interior panels.

56.     On October 10, 2022, Ms. Vanover contacted State Farm and made a claim under the State Farm Policy that was assigned claim number 4840L841C (the "Claim").

57.     During that initial call—as reflected, upon information and belief, in State Farm's claim notes—State Farm understood the damage to be to the "chassis" of the RV.

58.     State Farm failed to assign any adjuster to the Claim.  State Farm never came out to photograph or inspect the RV, or take any action whatsoever to evaluate the claim in good faith.

59.     Instead, State Farm requested that Ms. Vanover and Mr. Lambert submit photographs of the damage.

60.     As the damaged component of the tongue assembly was not immediately visible to Ms. Vanover or Mr. Lambert, they could not photograph it.  As such, Mr. Lambert and Ms. Vanover sent screenshots and photographs depicting how the damage manifested.

61.     On receipt of these photographs, State Farm forwarded the documentation to Snapsheet so that it could please its investor by reducing the claim.

62.     Snapsheet took a single look at the documentation, which showed the bowing of the interior panel due to pressure from a tongue assembly incapable of withstanding the weight of the RV, and concluded that the total cost of repairs was a mere $185.50 to "align and repair" the panel with "nails." *See Snapsheet Estimate*, attached hereto as **Exhibit A**.

63.     When presented with the estimate from Snapsheet, Ms. Vanover and Mr. Lambert immediately contacted State Farm to explain what, at that time, they believed to be a simple mistake on the part of State Farm and Snapsheet.

64.     In response, the State Farm representative informed Ms. Vanover that:

(a)     Snapsheet had generated the estimate;

(b)     that was State Farm's final estimate on the claim as State Farm—despite knowing that the claim was one for damage to the frame and/or structure of the RV—stood by Snapsheet's position;

(c)     State Farm would not send anyone to inspect the RV, because it was a "specialty vehicle" and State Farm lacked anyone qualified to inspect it;

(d)     the only way to change the claim was to secure a supplemental estimate at Ms. Vanover's expense;

(e)     That supplemental estimate would have to be done at a qualified RV repair shop to be considered credible by State Farm, despite the fact that the RV could not be towed;

(f)     Alternatively, State Farm represented—inconsistently—that the RV could be inspected at Ms. Vanover's home by a qualified RV repair person who could generate an estimate for consideration;

(g)     State Farm was not aware of any such qualified mobile RV repair person and had no obligation to assist Ms. Vanover in locating one;

(h)     If Ms. Vanover or Mr. Lambert attempted to tow the RV to said shop, any additional damages that occurred would not be covered by State Farm; and,

(i)     State Farm was not responsible for the cost of towing the RV.

Ms. Vanover retained the counsel shortly thereafter.

50.     Through counsel, Ms. Vanover again attempted to reason with State Farm's representative, including explaining that if State Farm or Snapsheet simply watched the videos rather than requiring photographs, they would see the irrelevance of Snapsheet's estimate.

51.     In response, State Farm informed Ms. Vanover, via counsel, that Snapsheet was only capable of accepting photographs, not videos, for its estimates.

52.     State Farm continued to maintain that any further consideration would be a supplemental estimate and Ms. Vanover's responsibility.

53. After considerable effort and expense, Ms. Vanover was able to identify RV repair specialist Bill Monaghan, who took pity on Ms. Vanover and Mr. Lambert's circumstances and ongoing cancer treatment.

54. Mr. Monaghan shut down his RV repair shop and went out to Ms. Vanover's home to conduct an inspection. Mr. Monaghan's inspection confirmed everything:

| QTY. | DESCRIPTION | PRICE | AMOUNT |
|------|-------------|-------|--------|
| | Transport fee | | 20,000.00 |
| | Labor | | 4,000 00 |
| | welder | | 4,000 00 |
| 3 | Caulk | 11.85 | 35 55 |
| | metal for bracing | | 200 00 |
| | shop items | | 1,000 00 |
| | | | 29,235.55 |
| | | tax | 1,754.13 |
| | | | 30,989 68 |

The hitch on the camper is loose has movement in a way it should not. Tells me a weld has been broken seems very unsafe. Hense the high transport fee. The break in weld or metal is in a place under the front cap. We have to remove front cap and possibly the bed room floor to fix then replace after welder is finished.

55. The total repair cost of $30,989.68 was submitted to State Farm. In response, State Farm sent this letter on September 15, 2023:

We received the estimate for Mr. Vanovers vehicle, we reached out to the repair facility to request additiaonl photos to suport their estiamte but were advised that the repair facility did not have posession of the vehicle. We need to set up a inspection to secure the photos that are needed for the proper evaluation of the estimate that was submitted for the damages being claimed. Please call me at your earliest convinience to discuss this matter and set up the inspeciton.

This demand for an inspection directly contradicts State Farm's prior representation that it lacked the ability to send anyone to inspect the RV.

56.    Two days later, State Farm reversed course again, offering a "total loss" to Ms. Vanover for the RV, apparently foregoing the "needed" inspection.

57.    Although State Farm attempted—and did, in fact—wrongfully shift the burden of investigation and proof to their insured, Ms. Vanover met the burden.

58.    Ms. Vanover substantially complied with all requirements and policy provisions of the State Farm Policy.  Ms. Vanover promptly, timely, and repeatedly substantiated her claim with documentary evidence of  losses to State Farm requesting payment of undisputed policy proceeds by State Farm or payment of her claim.

59.    State Farm knows, and always knew, Ms. Vanover's Claim was  covered and policy proceeds are due and owing to the plaintiff under the plaintiff's policy, but State Farm has neglected to pay undisputed policy proceeds and continues to search for a reason to delay, deny or justify its defense of the plaintiff's just claim for insurance proceeds.

60.    State Farm wrongfully and repeatedly denied and/or delayed Ms. Vanover's requests for claim payment as compensation for the loss with substantial encouragement and assistance of Snapsheet.  State Farm repeatedly denied Ms. Vanover's claim and/or unnecessarily prolonged its investigation making protracted disputes necessary to recover sums due and owing under the State Farm Policy.  State Farm chose this course of action despite the fact that Ms. Vanover advised State Farm that the Claim was righteous.

61.    Indeed, as of the date of this *Complaint*, State Farm has continued to fail to make the proper, unconditional payment to Ms. Vanover, instead making only conditional offers of settlement in an attempt to secure a release from Ms. Vanover for her Claim.  Succinctly, State

Farm had multiple opportunities to pay Ms. Vanover's claim for insurance benefits under the applicable automobile insurance policy prior to the eventual filing of this lawsuit, but refuses to acknowledge its obligations under the policy of insurance.

62.     At all times relevant, including at the time of and prior to filing this lawsuit, State Farm knew it was governed by the common law of first party insurance company claim misconduct, and by the West Virginia Unfair Claim Settlement Practices Act, W. Va. Code § 33-11-4, and the insurance regulations of the State of West Virginia, but ignored its obligation to the plaintiff in the handling of plaintiffs claim for insurance benefits.

63.     As set forth herein, State Farm's claims handling is part of a general business practice and course of conduct involving multiple violations of West Virginia statutory law and/or West Virginia Insurance Regulations.

64.     State Farm, by and through its agents, servants, officers, adjusters, and employees, violated the West Virginia Unfair Claims Settlement Practices Act, and West Virginia insurance regulations with such frequency as to indicate a general business practice, specifically including not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear and other violations of the Unfair Claims Settlement Practices Act.

65.     As a direct and proximate result of State Farm refusing and failing to pay the Claim and bad faith conduct, Ms. Vanover is required to employ the services of an attorney to institute this action to recover the just and proper damages to which she is entitled.  In turn, Ms. Vanover has suffered injuries, damages and other losses, including, but not limited to: (a) attorneys fees; (b) costs; and (c) expenses.

**Count I**
**(Common Law Claim Misconduct)**

66.     Plaintiff repeats and incorporates by reference paragraphs 1–65 of this Complaint as if fully set forth herein.

67.     State Farm's actions constitute unreasonable delay, wrongful denial of  coverage and/or wrongful withholding of payment for the Claim under the State Farm Policy.

68.     State Farm failed to make a fair good-faith investigation of the facts and circumstances surrounding plaintiffs' claim for insurance benefits and refused to extend coverage and adequately compensate the plaintiff for her covered claims.

69.     An insurance carrier's responsibilities toward its insured are clearly defined under West Virginia law to include the common law duty of good faith and fair dealing, and that duty is implied in all insurance contracts.

70.     An insurance company breaches the duty of good faith and fair dealing occurs when a policyholder must sue her own insurance company and the policy holder substantially prevails in such an action.

71.     An element of the duty of good faith and fair dealing is the obligation of the insurance company to promptly, fairly, and reasonably investigate the insured's claim for a loss.

72.     West Virginia law makes clear that "once a first-party insured submits a proof of loss, an insurance carrier has a duty to promptly conduct a reasonable investigation of the policyholder's loss based upon all available information."

73.     It is well-established that the insurance carrier's duty to investigate the claim is non-delegable.

74.     As a direct and proximate result of the acts alleged in this count of the Complaint, Plaintiff was damaged and injured as is hereinafter set forth.

**Count II**
**(Unfair Claims Settlement Practice Act)**

75.    Plaintiff repeats and incorporates by reference paragraphs 1–74 of this Complaint as if fully set forth herein.

76.    Plaintiff, individually and by counsel, repeatedly demanded insurance benefits owed to her by State Farm.

77.    Prior to this lawsuit being filed, the plaintiff advised State Farm that the claim for insurance benefits was covered under the State Farm insurance policy and the damages were due and owing under the Plaintiffs' policy of insurance.

78.    Plaintiff made numerous demands and was wrongfully denied by defendant State Farm insurance benefits despite State Farm having actual knowledge that policy proceeds were owed to her.

79.    Prior to this lawsuit being filed, defendant State Farm repeatedly denied Plaintiff's reasonable requests for benefits under the State Farm Policy and made misrepresentations regarding State Farm's ability to investigate the loss, inspect the RV and the use of its Snapshot estimating tool.

80.    As a direct and proximate result of the acts of defendant State Farm, by and through its agent(s), employee(s) and/or representative(s) in refusing to cover and failing to pay Plaintiff's claim for policy proceeds, Plaintiff was required to employ the services of attorneys to institute litigation in order to recover the just and proper compensation as a result of the loss described hereinabove.

81.    Shortly after the Claim was made, and before the filing of this lawsuit, State Farm knew that Plaintiff's claim for insurance benefits was righteous and that it owed payment under

the State Farm Policy and that the claim had a value far in excess of State Farm's initial low-ball

offer via the Snapsheet estimate.

82.    Plaintiff was forced to file this lawsuit because of the acts and omissions of State

Farm, including but not limited to:

 (a) failure to conduct a prompt and reasonable investigation;

 (b) attempting to coerce the plaintiff into accepting an unjust settlement;

 (c) attempting to take advantage of an insured who was suffering from cancer;

 (d) unreasonably refusing to acknowledge that State Farm was liable for Plaintiff's claim for benefits;

 (e) failing to negotiate in good faith;

 (f) unreasonably refusing to acknowledge pertinent communications;

 (g) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

 (h) failure to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

 (i) misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

 (j) failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

 (k) refusing to pay claims without conducting a reasonable investigation based upon all available information;

 (l) failing to promptly provide a reasonable explanation of the basis in the State Farm Policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement;

 (m) failure to conduct a meaningful investigation of the facts and circumstances of the claim prior to denying coverage;

 (n) failing to promptly adjust and pay the covered damages and losses sustained by Plaintiff, which damages and losses were covered by the State Farm Policy;

 (o) failing to deal with plaintiffs in a good faith manner; and/or,

(p)    other acts and omissions by State Farm.

83.    State Farm and their agents, servants, officers, adjusters, and employees violated the West Virginia Unfair Claims Settlement Practices Act, West Virginia Code § 33-11-4(9), the Unfair Trade Practices Act, as well as the insurance regulations promulgated thereunder, including, but not limited to, the following:

(a)    Failed to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(b)    Failed in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

(c)    Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

(d)    Refusing to pay claims without conducting a reasonable investigation based upon all available information;

(e)    Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds, when such insureds have made claims for amounts reasonably similar to the amounts ultimately recovered;

(f)    Attempting to starve the plaintiff into an unjust settlement;

(g)    Failing to negotiate in good faith;

(h)    Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

(i)    Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; and/or

(j)    other acts and omissions.

84.    Plaintiff's request for insurance benefits under the State Farm Policy were systematically denied by State Farm, which was substantially encouraged and assisted by

Snapsheet, and Plaintiff was forced to retain counsel in order to recover and in order to establish the full amount of her damages as she is entitled to under the law.

85.     State Farm had multiple opportunities to settle Plaintiff's Claim prior to the filing of this lawsuit.

86.     State Farm, by and through its agents, servants, officers, adjusters, and employees committed violations of the West Virginia Unfair Claims Settlement Practices Act and West Virginia insurance regulations with such frequency as to indicate a general business practice.

87.     As a direct and proximate result of the acts alleged in this count of the Complaint, the Plaintiff was damaged and injured as is hereinafter set forth.

### Count III
### (Breach of Contract)

88.     Plaintiff repeats and incorporates by reference paragraphs 1–87 of this Complaint as if fully set forth herein.

89.     Plaintiff paid State Farm valuable consideration for insurance coverage in the form of insurance premiums.

90.     In consideration of said premiums, State Farm issued Plaintiff the State Farm Policy.

91.     The State Farm Policy constitutes a contract for insurance coverage which was in effect on and about October 1, 2022.

92.     In addition, the State Farm Policy includes an implied covenant of good faith and fair dealing, which State Farm has breached through the conduct set forth herein.

93.     On or about October 1, 2022, Plaintiff suffered a covered loss, as that term is defined, under the State Farm Policy.

94.     Plaintiff complied with all terms and conditions of the State Farm Policy.

95.     State Farm has failed to provide the insurance coverage that it contracted for with Plaintiff and is, therefore, in breach of the State Farm Policy.

96.     In addition, State Farm has breached the State Farm Policy as follows:

(a)     failure to conduct a prompt and reasonable investigation;

(b)     attempting to coerce the plaintiff into accepting an unjust settlement;

(c)     attempting to take advantage of an insured who was suffering from cancer;

(d)     unreasonably refusing to acknowledge that State Farm was liable for Plaintiff's claim for benefits;

(e)     failing to negotiate in good faith;

(f)     unreasonably refusing to acknowledge pertinent communications;

(g)     not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

(h)     failure to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(i)     misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

(j)     failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

(k)     refusing to pay claims without conducting a reasonable investigation based upon all available information;

(l)     failing to promptly provide a reasonable explanation of the basis in the State Farm Policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement;

(m)     failure to conduct a meaningful investigation of the facts and circumstances of the claim prior to denying coverage;

(n)     failing to promptly adjust and pay the covered damages and losses sustained by Plaintiff, which damages and losses were covered by the State Farm Policy;

(o)     failing to deal with plaintiffs in a good faith manner; and/or,

(p)     other acts and omissions by State Farm.

97.    In addition, State Farm breached the covenant of good faith and fair dealing by putting its own interests before the interests of its policyholders.

98.    As a direct and proximate result of the acts alleged in this count of the Complaint, Plaintiff was damaged and injured as set forth herein.

## Count IV
### (Civil Conspiracy, Substantially Encourage and Assist, Joint Venture)

99.    Plaintiff repeats and incorporates by reference paragraphs 1–98 of this Complaint as if fully set forth herein.

100.    State Farm and Snapsheet, by and through their concerted action described hereinabove, sought to accomplish an unlawful purpose and/or to accomplish some purpose, not in itself unlawful, by unlawful means.

101.    Specifically, State Farm and Snapsheet conspired to unlawfully reduce first party claim payment  in violation of West Virginia insurance law to increase State Farm's corporate profit.  In turn, State Farm's increase in corporate profit inures to Snapsheet's benefit as an investment of State Farm and a vendor thereto.

102.    Defendants' wrongful acts causing injury to Plaintiff created create a civil conspiracy prohibited by law.

103.    While civil conspiracy is not a *per se*, a stand-alone cause of action; however, it is a legal doctrine under which liability for the tortious conduct of State Farm may be imposed on Snapsheet, regardless of whether Snapsheet did not actually commit the hereinabove violations of West Virginia insurance itself insofar as Snapsheet shared a common plan for the commission of unfair claim settlement practices, unfair trade practices and insurance bad faith with State Farm.

104.    Snapsheet substantially encouraged and assisted State Farm in its efforts to reduce first party claim payment to increase corporate profit.

105.    Snapsheet acted in concert with State Farm pursuant to a common design or plan.

106.    Snapsheet's advice and/or encouragement to State Farm regarding the value of the Claim gave support to State Farm's illegal conduct when Snapsheet knew the conduct was illegal.

107.    Snapsheet's advice and/or encouragement was a substantial factor in causing the tortious conduct of State Farm.

108.    Defendants engaged in a joint venture and/or an association of two or more entities to carry out a single business enterprise for profit, for which purpose they combined their property, money, effects, skill, and knowledge.

109.    As a direct and proximate result of the acts alleged in this count of the Complaint, Plaintiff was damaged and injured as set forth herein.

**DAMAGES**

110.    Plaintiff repeats and incorporates by reference paragraphs 1–109 of this Complaint as if fully set forth herein.

111.    Some or all of Defendants' acts as alleged hereinabove in each paragraph and/or each count of this Complaint were willful, wanton, and malicious and/or reckless and/or in reckless disregard for the civil rights of their insureds.

112.    Defendants knew or should have known that Plaintiff's claim was righteous but knowingly refused to properly adjust the total loss and willfully, maliciously and intentionally undervalued the claim to increase State Farm's corporate revenue.

113.    As a direct and proximate result of Defendants' conduct, as alleged in this Complaint, Plaintiff has suffered the following compensable losses:

    (a)    Psychological trauma, harm to physical health, anxiety, inconvenience, emotional distress, anger, anguish, depression, disappointment, embarrassment, fear, fright, grief, horror, loss of use of insurance benefits and/or humiliation;

   (b)    Unnecessary costs and expenses;

   (c)    Cost and stress of retaining counsel to recover benefits from State Farm to which she was entitled;

   (d)    Attorneys' fees;

   (e)    Insurance benefits wrongfully withheld;

   (f)    Economic losses; and,

   (g)    Other injuries, damages and losses.

**WHEREFORE**, Plaintiff Terry Vanover demands judgment against Defendants State Farm Mutual Automobile Insurance Company and Bodyshopbids, Inc., d/b/a Snapsheet, Inc. for the following:

   (a)    compensatory damages to which they are entitled to for the wrongs alleged in the various paragraphs and counts of this Complaint in an amount in excess of the jurisdictional limits of this Court;

   (b)    punitive damages in an amount that will punish the Defendants, and deter the Defendants from committing this type of conduct in the State of West Virginia in the future, and by setting an example, deter other insurers from committing this type of conduct in the State of West Virginia in the future and in such amount as will satisfy all other reasons of law and public policy for an award of punitive or exemplary damages;

   (c)    attorney fees;

   (d)    pre-judgment interest;

   (e)    post-judgment interest;

   (f)    costs; and,

   (g)    such other relief as the Court or jury deems just.

The minimum jurisdictional amount for filing this action has been satisfied.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

                              **TERRY VANOVER,**

                              **By Counsel,**

27

   /s/  *David A. Bosak*          
David A. Bosak (WV State Bar # 11947)
**BAILEY JAVINS & CARTER LC**
213 Hale Street
Charleston, West Virginia 25301
Telephone: (304) 345-0346
Facsimile: (304) 345-0375
dbosak@bjc4u.com

/s  *George N. Sidiropolis*               
George N. Sidiropolis, Esq. (WV State Bar # 10391)
**FLANIGAN LEGAL, PLLC**
1140 Main Street, 4th Floor
Wheeling, WV 26003
Phone: (304) 233-7766
george@flaniganlegal.com