## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| **TERRY VANOVER,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Action No.: 5:23-cv-00802** |
| | * | **Honorable Frank W. Volk** |
| **STATE FARM MUTUAL** | * | |
| **AUTOMOBILE INSURANCE** | * | |
| **COMPANY and** | * | |
| **BODYSHOPBIDS, INC.,** | * | |
| **d/b/a SNAPSHEET, INC.,** | * | |
| | * | |
| **Defendants.** | * | |

---

### AMENDED COMPLAINT

---

Terry Vanover, pursuant to this Court's *Order*, Document 56, states as follows for her *Amended Complaint* ("Complaint") against Defendants State Farm Mutual Automobile Insurance Company and Bodyshopbids, Inc., d/b/a Snapsheet, Inc.

### PARTIES

1.    Plaintiff Terry Vanover is, and at all times relevant herein was, a resident and citizen of Wyoming County, West Virginia.

2.    Defendant State Farm Mutual Automobile Insurance Company ("State Farm") is an insurance company chartered in Illinois and with a principal place of business at One State Farm Plaza, Bloomington, Illinois 61710.  At all relevant times, State Farm was authorized to do business as an insurer in the State of West Virginia by the West Virginia Offices of the Insurance Commissioner ("WVOIC") subject to compliance with West Virginia laws and regulations on the provision of insurance products.

3.    Defendant Bodyshopbids, Inc. d/b/a Snapsheet, Inc. ("Snapsheet") is a Delaware corporation with its principal place of business located in Illinois.  At all relevant times, Snapsheet provided a service designed to reduce losses ("claim payment") for insurance companies via its claims software.  At relevant times, Snapsheet was partially funded by State Farm Ventures, LLC, which is a wholly-owned subsidiary of State Farm.

### JURISDICTION and VENUE

4.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1332 in that the amount in controversy exceeds $75,000.00, exclusive of costs and interest, and involves citizens of different states.

5.    Defendants availed themselves to the jurisdiction of this Court pursuant to W. Va. Code § 56-3-33 and W. Va. Code § 31D-15-1501(d)(3), by doing, personally and through its agents, the following acts:

a.    Committing tortious acts within this state by engaging in bad faith provision of insurance services in West Virginia via use of estimating software designed to artificially reduce claim payment;

b.    Selling, distributing, assembling and/or servicing its products in West Virginia with the purpose of exploiting the West Virginia insurance market;

c.    Deriving substantial revenues in this state;

d.    Causing injuries to persons in West Virginia, including Ms. Vanover; and,

e.    Engaging in the solicitation of activities in West Virginia to promote the sale, consumption, use, maintenance and distribution of Defendants' insurance and property damage estimating software and/or other products.

6.    Venue is proper in the United States District Court for the Southern District of West Virginia pursuant to 28 U.S.C. § 1391(a) as a substantial portion of the events giving rise to the claims herein took place in Wyoming County, West Virginia, which is within the judicial district of this Court.

**THE AGREEMENT TO INSURE THE STATE FARM POLICYHOLDER**

7.      State Farm has been continuously registered as an insurance company conducting business in West Virginia since 1929.  Among other products, State Farm provides homeowners, auto and recreational vehicle ("RV") insurance products in West Virginia.

8.      Plaintiff Terry Vanover entered into a contractual agreement with Defendant State Farm Mutual Automobile Insurance Company and paid valuable consideration for an insurance policy.  Specifically, Ms. Vanover purchased State Farm Recreational Vehicle Policy No. 148138348 (the "State Farm Policy"), which provided coverage for her 2014 Keystone Mountaineer RV, VIN # 4YDF34526E4730009 (the "RV").

9.      The State Farm Policy states: "Insuring Agreement We will pay for loss to a covered vehicle."

10.      Loss under the State Farm Policy means "direct, sudden, and accidental damage to … a covered vehicle."

11.      The State Farm Policy further states "Covered Vehicle means … your recreational vehicle."

12.      The State Farm Policy provides that State Farm "will pay . . . damages an insured becomes legally liable to pay because of: . . . damage to property caused by an accident that involves a vehicle for which that insured is provided . . . Coverage by this policy."

13.      State Farm has admitted that the loss in question was a covered loss under the subject policy of insurance.

14.      State Farm's "First Party Coverage Seminar", upon information and belief, serves as training materials for State Farm adjusters handling auto claims and applies to claims under recreational vehicle policies.

15.     State Farm's "First Party Coverage Seminar" identifies and discusses many good faith obligations and industry standards for claim handling, and contains a major focus on first party claims.  It instructs State Farm claim handlers as follows:

      a.      An insurer should make a reasonable attempt to effectuate prompt, fair and equitable settlements of claims whenever coverage, liability, and damages have become reasonably clear.

      b.      An insurer should not delay resolution of a claim by requiring an insured to produce information which the insurer already has, or can reasonably, obtain.

      c.      An insurer has an implied duty to resolve a claim once it has acquired enough evidence and information to establish the validity of a claim.

      d.      An insurer is required to pursue resolution of insured's claims with reasonable diligence.

      e.      Claim investigations should be objective and designed to acquire information that is reasonably related to the claim.

      f.      When necessary for claim resolution, an insurer should select objective experts to assist the insurer in making claim decisions.

      g.      Insurers have a duty to disclose policy terms, conditions, and obligations to insureds.

      h.      The insured may not be required to produce information the insurer already has, or can reasonably obtain.

      i.      An insured should be provided an opportunity to explain discrepancies, or to challenge information that we relied upon when making coverage, liability, and/or damage decisions. Insureds should be advised of our willingness to reconsider our position if new information becomes available. (Assuming the claim or part of the claim was reduced or denied.)

16.     State Farm gives every claim handler a document that lays out the basics of good faith claim handling at State Farm.  This document, "Our Commitment to Our Policyholders" includes, in part, the promise to:

      a.      Listen, be fair, be open, and carry out our part of the bargain under the contract in good faith.

b.     Be familiar and in compliance with those laws and regulations that impact claims to the appropriate state, and treat policyholders consistent with requirements of the law.

c.     Explain all relevant coverages under the policy. Encourage policyholders to report all losses and avail themselves of all benefits under their coverages.

d.     Diligently investigate the facts to determine if a claim is valid, reasonably evaluate the claim, and act promptly in resolving the claim. If it necessary to reject a claim for coverage or damages, it should be done promptly and courteously, with an explanation for the decision.

e.     Make an objective evaluation of the facts and circumstances supporting our policyholders' claims. Doing so helps ensure our policyholders obtain all benefits available provided by the insurance policy.

f.     Give insureds a reasonable opportunity to comply with their responsibilities under the policy. If a claim is rejected, be willing to listen to subsequent input from the insured. Complete any necessary follow up in a timely fashion, giving due consideration to any additional findings**.**

17.    In the Winter 2007 Claims Quarterly Magazine, State Farm's Vice President of Claims Susan Hood discussed "Our Commitment To Our Policyholders" and State Farm's obligations to their policyholders. She stated:

Since the mid-1990s, Our Commitment to Our Policyholders has been the written foundation for how we handle claims at State Farm. It's something we've always practiced, but putting Our Commitment in writing gave us an opportunity to articulate our claim-handling philosophy and what we in Claims do.

Our policyholders place their trust in State Farm when they purchase insurance from us, and when they have a claim, we take pride in keeping our promise to them to pay what we owe, promptly, courteously, and efficiently.

Our Commitment is about our responsibilities in Claims. It's about how we treat our customers. It's about providing the best claim service in the industry. And above all, it's always all about our policyholders. Everything starts and ends with them.

**Compliance.**
We must comply with the laws and regulations under which we operate.

**Explaining coverages.**
It's such an important part of our job in Claims to explain to our policyholders all coverages available to them. This can be complex sometimes, but we must take time to thoroughly review the policy and circumstances of the loss in order to ensure our policyholders receive the full benefits of their coverages according to the terms of their policy. This is just the right thing to do. When a claim is not covered, we must promptly and courteously explain why.

**Investigation and evaluation.**
Thorough investigation, evaluation, and timely resolution of a claim also are critical parts of what we do. By knowing the facts of the loss and understanding the terms of the policy, we are able to make sure our customers receive the benefits available to them. Our evaluations must be objective, and each claim must be evaluated on its own merits.

**Due consideration.**
We must be willing to listen to input from our policyholders and thoroughly review any additional information they may present. It is important that we carefully consider all information available in our evaluation and investigation of a claim.

18.     State Farm knows, or should know, that undermining first party policy benefits carries the risk of increasing the insured's emotional and financial distress.

19.     With such knowledge, the public reasonably expects an insurer to implement and enforce claim principles to carry out the policy's purposes with a high degree of skill, supervision, and concern for the insured.

20.     The National Association of Insurance Commissioners created a Model Unfair Claims Practices Act that provides statutory and regulatory standards for the handling of insurance claims. These represent a codification of well-established insurance industry standards. Over 45 states have adopted the Model Unfair Claims Practices Act, including West Virginia, either in part or in its original form.

21.    West Virginia's Code (Chapter 33) enumerates fifteen actions by insurance companies that amount to unfair claim settlement practices.  These items include, but are not limited to:

> (9)  Unfair claim settlement practices. -- No person shall commit or perform with such frequency as to indicate a general business practice any of the following:
>
> > (a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;
> >
> > (b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;
> >
> > (c) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
> >
> > (d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;
> >
> > (e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
> >
> > (f) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;
> >
> > (g) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by the insureds, when the insureds have made claims for amounts reasonably similar to the amounts ultimately recovered;
> >
> > (h) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;
> >
> > (i) Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of, the insured;

(j)  Making claims payments to insureds or beneficiaries not accompanied by a statement setting forth the coverage under which payments are being made;

(k) Making known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration;

(l) Delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

(m) Failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage;

(n)  Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement;

22.     Further, West Virginia Legislative Rules, Insurance Commissioner, SERIES 14

defines **UNFAIR TRADE PRACTICES** (114CRS14) that includes:

**§114-14-3. File And Record Documentation.**
The insurer's claim files shall be subject to examination by the Commissioner or by his or her duly appointed designees. Such files shall contain all notes and work papers pertaining to the claim in such detail that pertinent events and the dates of such events can be reconstructed. All communications and transactions emanating from or received by the insurer shall be dated by the insurer. A notation of the substance and date of all oral communications shall be contained in the claim file. Insurers shall either make a notation in the file or retain a copy of all forms mailed to claimants.

**§114-14-5. Standards For The Acknowledgment Of Pertinent Communications**
*5.3. Replies to other pertinent communications. –*

8

A reply shall be made within fifteen (15) working days of receipt by the insurer to all other pertinent communications from a claimant which reasonably suggest that a response is expected. 5.4. Provisions of assistance to first-party claimants. -- Every insurer, upon receiving notification of a claim, shall ***promptly provide*** necessary claim forms, instructions, and reasonable assistance so that first-party claimants can comply with the policy conditions and the insurer's reasonable requirements. Compliance with this subsection within fifteen (15) working days of notification of a claim constitutes compliance with subsection 5.1. of this section.

**§114-14-6. Standards For Prompt Investigations And Fair And Equitable Settlements Applicable To All Insurers.**

*6.1. Investigation of claims. –*

Every insurer shall promptly conduct and diligently pursue a thorough, fair and objective investigation and may not unreasonably delay resolution by persisting in seeking information not reasonably required for or material to the resolution of a claim dispute. This section is not intended to conflict with the statutory requirements of the Medical Professional Liability Act, W. Va. Code §§55-7B-1 to 11, as the same relate to the assertion and investigation of medical professional liability claims.

*6.3. Duty after investigation. –*

Within ten (10) working days of completing its investigation, the insurer shall deny the claim in writing or make a written offer, subject to policy limits and, with respect to medical professional liability claims, subject to applicable statutory requirements set forth in the Medical Professional Liability Act, W. Va. Code §§55-7B-1 to 11.

*6.4. Offers of settlement. –*

a. In any case where there is no dispute as to coverage and liability, it is the duty of every insurer to offer claimants or their authorized representatives, amounts which are fair and reasonable, as shown by the insurer's investigation of the claim, providing the amounts so offered are within policy limits and in accordance with the policy provisions.

b. No insurer may attempt to settle a claim by making a settlement offer that is unreasonably low. The Commissioner shall consider any evidence offered regarding the following factors in determining whether a settlement offer is unreasonably low:

    1. The extent to which the insurer considered evidence submitted by the claimant to support the value of the claim;

2. The extent to which the insurer considered legal authority or evidence made known to it or reasonably available;

3. The extent to which the insurer considered the advice of its claims adjuster as to the amount of damages;

4. The extent to which the insurer considered the opinions of independent experts;

5. The procedures used by the insurer in determining the dollar amount of property damage;

6. The extent to which the insurer considered the probable liability of the insured and the likely jury verdict or other final determination of the matter; and

7. Any other credible evidence presented to the Commissioner that demonstrates that the final amount offered in settlement of the claim by the insurer is or is not below the amount that a reasonable person would have offered in settlement of the claim after taking into consideration the relevant facts and circumstances at the time the offer was made.

These regulations impose certain duties and obligations on an insurer in the handling of claims consistent with the claims handling standards cited above.

23.     Profit is properly addressed and the responsibility of other departments of an insurer.  This would include such departments as sales, marketing, underwriting, and others. Within the insurance industry, it has customarily been considered inappropriate for claims to be responsible in any way for profit.  A department responsible for assisting insureds in obtaining all benefits available under the policy cannot fulfill this obligation in good faith with incentive or pressure to pay less.

24.     The AIC-33 (Associate in Claims) textbook, *The Claims Environment* was utilized by Defendant State Farm Mutual Automobile Insurance Company to train its claims handlers regarding industry standard claims handling practices.

25.     *The Claims Environment* states, "The standard for documentation is that the file should speak for itself.  The basis for all decisions should be clear, all communications to and from the claim representative should be recorded, and is should be possible at any stage in the file's life

to transfer it from one claim representative to another.  Upon transfer of a file, what has been done and what remains to be done should be clear."  (Markham, First Edition, 1993, p. 340).

26.    "Good claim handling alone is not enough to avoid bad faith claims.  Supporting evidence must be in the file to establish that the good work was indeed done.  If the documentation is not in the file, then it can only be assumed that nothing happened. " *The Claims Environment* p. 249.

27.    The absence of good log notes, correspondence, and investigative and evaluative material is another indicator that the claim representatives were not doing their job properly." *The Claims Environment* p. 249.

28.    "When a policyholder submits a claim to an insurance company, he or she does so on the belief that the matter in question is covered by the policy.  Yet, policyholders generally do not understand all of the circumstances that are or are not covered in the policy and are not familiar with every provision in the policy affecting the amount they can recover." *The Claims Environment* p. 59.

29.    Regardless of title, whether it is; claims examiner, claims specialist, SIU investigator, contractor, or attorney; the person conducting/accomplishing the above tasks is considered by the industry as a claim handler.  *State ex rel. Medical Assurance of West Virginia, Inc. v. Recht*, 213 W.Va. 457, 484, 583 S.E.2d 80, 107 (2003) (to the extent the law firm acted as claims adjusters, their work product would be treated as created in the ordinary business of the insurance company, outside the attorney-client and work product privileges).

30.    All claim handlers are required to meet industry standards, act in good faith, treat the insured fairly and give equal consideration to the interests of the insured.

31.     The claim adjustment process begins with the assignment of a claim to a claim representative.

32.     The following are four tasks the claim representative must accomplish:

    a.     Investigation;
    b.     Evaluation of coverage, liability, and damages;
    c.     Negotiation or alternate dispute resolution (ADR) to achieve settlements; and,
    d.     If necessary, litigation management.

*The Claims Environment* p. 9.

33.     When an insured purchases insurance, part of what he pays for is a reasonable and even-handed investigation.

34.     "In a claim adjustment process, the claim is investigated, coverage and liability are determined, damages are measured, and if necessary, the claim is litigated. These tasks are carried out either by staff employees of the insurance company or by outside claim – adjusting services. Professionals and specialists in various fields, as well as fellow employees in the insurance company, also lend their support to the process." *The Claims Environment* p. 9.

35.     Industry standards require claim handlers to know, and comply with, applicable law and regulations that impact claim handling and treat policyholders in a manner consistent with requirements of the law.

36.     Part of every policy is a promise that the parties will deal fairly with one another. This implied covenant of good faith and fair dealing requires that neither party do anything to impact the right of the other to receive the benefit of the agreement. With an insurance policy, a special relationship arises out of the parties' unequal bargaining power and the special nature of the insurance contract.  The insurer has a much greater obligation to perform under the policy than the typical insured, who knows little of insurance transactions.

37.     An insurer is in a position to take advantage of an insured's misfortune by

bargaining for settlement or resolution of the claim for less than the true amount owed.

38.    The insurer has control over the investigation, evaluation, processing, and denial of the claim.

39.    The insurer also has superior knowledge and buying power for the repairs and services following a loss.

40.    This unequal power creates an enhanced duty on the insurer to place the interests of its insured at least equal as its own.

41.    The duties of good faith and fair dealing are embedded within the industry and are taught and accepted as claim handling industry standards.

42.    These require an insurer to do nothing to injure the rights of the insured to receive benefits under the policy.

43.    Knowing and following the underlying precepts of claims work is crucial to fair claim practices. For example, an insurer must:

   a.    perform a full, fair and reasonable investigation of a claim, the investigation must be thorough and objective, and that in the investigation, an adjustor is required to look for reasons to support payment of the claim;

   b.    give equal consideration to the insured's interests;

   c.    investigate additional facts learned during investigation and, if appropriate, re-evaluate the claim;

   d.    make claims decisions based on facts; first party claims cannot be denied or a reduced offer made on speculation or guesswork;

   e.    understand that when conducting an investigation of a claim, whether coverage or damages, the claim handlers are not just investigating on behalf of State Farm, but also on behalf of the policyholder.

   f.    understand that decisions regarding coverage or liability are determined based on objective facts, gathered through a thorough and impartial investigation, giving equal weight to the evidence that supports coverage.

   g.    understand that it is the insurer which has control over the investigation,

evaluation, processing, and denial of a claim.

h.    not unreasonably offer less than is owed on any first party claim, including "lowball" offers on claims;

i.    not unreasonably force an insured claimant to litigate or arbitrate in order to obtain benefits;

j.    not allow adjusters to have a conflict of interest that would sway their decisions one way or the other when they are adjusting a claim; and,

k.    ensure adjusters know and comply with laws and regulations that impact claims in the appropriate state, and treat all insureds consistent with requirements of the law.

44.    The relevant and well-established principles of insurance policy interpretation (and industry standards) may be described as follows:

a.    Any ambiguities that may exist in an insurance policy -- involving two conflicting interpretations of a policy provision wherein one interpretation is favorable to the insured and one is favorable to the insurer -- are always decided in favor of the insured;

b.    An insurance policy is interpreted in accordance with the reasonable expectations of the insured;

c.    An insurer must give at least equal consideration to the insured's interests; and,

d.    Undefined words are given their common meaning.

45.    These generally accepted claim handling principles or insurance industry standards are well known within the industry and they are taught at many claim schools, including at State Farm.

46.    They are often written within procedural and claim handling guides, including those found at State Farm, and found in numerous publications including industry-sponsored educational textbooks.

47.    "[C]laims representatives should have expert knowledge of insurance policy coverages, the law, and determination of damages" *The Claims Environment* at p. 12.

48.    Industry standards require claim handlers to know and comply with applicable law and regulations that impact claim handling and treat policyholders in a manner consistent with requirements of the law.

49.    The claim representative's chief tasks are to investigate, evaluate, and resolve the claim.

50.    When an insured purchases insurance, part of what he pays for is a reasonable and even-handed investigation.

51.    It is the duty and responsibility of the insurer to investigate both liability and damages.

52.    It is the insured's responsibility to cooperate with the investigation, not to undertake the investigation or incur the cost.

53.    This duty to investigate is central to proper claim handling.

54.    Industry standards include this obligation and are clearly detailed in *The Claims Environment* where it states "A thorough investigation is the foundation of good faith claim handling.  Claim representatives must conduct a ***prompt*** and objective investigation, using the right personnel and collecting all relevant evidence.  Investigation should continue as long as new facts develop or become available." p. 249 (emphasis added).

55.    The AIC 33 textbook, "Aggressive Good Faith and Successful Claims Handling" (Rokes, First Edition, 1987) discusses the failure to conduct a proper investigation and states:

> Where the insurer fails to investigate the case properly, however, there is no question that the insurer is in breach of contract.  Further, there is no question that the insurer has been negligent by omitting to conduct a proper investigation, one of the responsibilities under the contract.  The right to recover for breach of contract or for the tort of negligence would seem to be apparent.  Whether the failure to investigate constitutes an extraordinary showing of disingenuous or dishonest failure to carry out a contract is certainly a question of

fact.  It certainly demonstrates the existence of a nebulous threshold between negligence and what is considered to be "bad faith."

## STATE FARM'S GENERAL BUSINESS PRACTICE
## OF UNFAIR CLAIMS SETTLEMENT

56.     State Farm's goal is to be the most profitable claim service in the industry.

57.     State Farm has enacted several programs aimed at improving corporate profitability.

58.     These programs included multiple management level redesigns of State Farm's claims operation.

59.     As part of State Farm's corporate redesign of its claims operation, State Farm has implemented tactical programs that utilized employee evaluations, incentives and bonus programs that provide financial rewards to claims department employees to decrease claim payment and increase State Farm's profits.

60.     For example, State Farm adopted its Automobile Model Excellence Exceptions program, which provides, or provided, bonuses and/or incentives to claims handlers, supervisors, and/or managers in an effort to reduce claim payment and increase corporate revenue.

61.     State Farm has also historically trained its adjusters to only value auto property damage that is visible to the naked eye.  Upon information and belief, in some form or another, this practice continues to this day.

62.     Between its directives to its adjusters and its utilization of systemic vendor claims estimation software designed to lowball claims, State Farm operates a systematic and fraudulent scheme to miscalculate the vehicles' value in a manner that does not align with its contractual obligations in order to illegally increase its own profits.

63.     As a result of State Farm's estimating procedures, its estimates are routinely less than fair.

64.     State Farm CEO Michael Tipsord revealed that, in 2022, State Farm recorded $13 billion dollars in underwriting loss, the largest in its 100-year history.  The loss relates primarily to State Farm's auto insurance companies, which—while reporting earned premium of $45.7 billion— incurred claims and loss adjustment expenses of $48.4 billion and other underwriting expenses of $10.8 billion resulted in the captive's highest-ever underwriting loss.  As a result, State Farm is even more incentivized to underpay claims; specifically, by aggressively utilizing AI software as a means of recovering "missed profit."

## STATE FARM AND SNAPSHEET

65.     Sometime prior to October 2022, State Farm began utilizing estimating software and services provided by Snapsheet.  Today, as an investor in Snapsheet, State Farm has a financial interest in Snapsheet's success and in Snapsheet's mission to help insurers—including itself— reduce loss to increase revenue.

66.     State Farm has employed the use of Artificial Intelligence ("AI"), including, but not limited to, defendant Snapsheet's estimating software.  State Farm uses Snapsheet's AI estimation program to reduce claim payment and increase corporate revenue.

67.     Snapsheet's estimating software deliberately undervalues damage claims; is incapable of valuing damage and/or property loss that is invisible to the naked eye; is incapable of appropriately valuing damage to component parts, frame damage and/or malalignment; and, is incapable of appropriately estimating damage by analyzing photos of the vehicle in conformity with State Farm's guidelines for the software.

68.    Snapsheet was founded with no connections whatsoever to the insurance industry; however, co-founded CJ Przybyl managed to obtain a meeting with the Chief Financial Officer of "one of the largest insurance carriers in the country."

69.    During that meeting, Snapsheet founders deliberately presented screenshots of a non-functional application for claims-management as being fully functional to secure a contract and/or investment.

70.    Snapsheet then relied on a belief that "contracting would take at least three months" and elected to "build a working product" during that time period "which became the foundation of what Snapsheet is today."

71.    From the very beginning, Snapsheet was built on deception and a rushed product designed solely to increase insurance company revenue by reducing claim payment. Since then, Snapsheet has become a company that, for example, will represent itself to be an insurer's appraisal team and directly communicate with its clients' insureds. While Snapsheet claims to be nothing more than an appraisal software developer, playing no role in how to adjust claims or settle disputes, its communications with Plaintiff as described herein undermine this claim.

72.    Scott Topper, Global Vice President of Customer Solutions, plainly states, "we work with insurance companies to help them Outsource a part of their claims process right that's what that business is doing" on the Snapsheet Official YouTube page. Topper remarked, "It started off as a b2c business for body shops but quickly realized most of the industry is driven on um Insurance most people use insurance so we quickly pivoted to become a B2B model and partnered with insurance carriers in the industry to be able to provide virtual claims estimating for auto damage and that's really where we started and that's the our business grew from there and we had

to build technology to be able to support and experience the customers were expecting."

https://www.youtube.com/watch?v=xG6xoqC69C4 at 7:46.

73.     Insurance Business Magazine describes Snapsheet as "an insurance technology company that can handle multiple elements in the claims process: Virtual appraisals after accidents, claims software and payments once a claim is resolved."

74.     Snapsheet claimed on its website that it will transform the "business of insurance."

https://v2.snapsheetnetwork.com/2018/01/19/insurtech-revolution-will-transform-the-business-of-insurance/.

75.     Sean Gergets, Director of Estimating and Steve Hawes, Director of Estimating QA, at Snapsheet, publicly represent and advertise the following on behalf Snapsheet:

> Gergets: The one thing that I would want all adjusters to know is that Snapsheet is the leader in making claims simple through partnership
> …
> Hawes: If I was talking to an adjuster right now the one thing I would want them to know is that we are here to partner when we first start the onboarding process we start by reviewing their guidelines and then training our team for calibration once we initiate the rollout we are in constant contact with internal staff MD staff just to ensure that we are calibrating and writing by the carriers guidelines in terms of estimatics Parts usage estimating best practices and with constant contact with uh with your company we're ensuring that we're aligned and the product estimate that you're receiving is on par with your estimating staff with your DRP networks or whatever other mode of inspection that you do have

https://www.youtube.com/watch?v=xQLbAqnkxmI, 0:05-1:37.

76.     In fact, Snapsheet CEO Brad Weisberg plainly acknowledges that for the appraisal business Snapsheet operates like an independent adjuster. *See* https://www.youtube.com/watch?v=O2ViAQ5zkTI at 42:56-43:01 ("Q: I mean in a way you guys

are kind of independent adjusters. A: For a piece of our business yes for the appraisals business yes.").

77.    Snapsheet's controller, Tim Lackey, admits Snapsheet is a third-party administrator: "what we really are is we're a tech company we're focused on facilitating the claims administration process for our customers." https://www.youtube.com/watch?v=AAEBBAFgRHA

78.    Snapsheet publicly acknowledges, "We're here to help you get ready to harness the true power of data and automation to make better, faster claims handling decisions, reduce indemnity leakage, and increase profitability!" Connected Claims 2022.

79.    The same message was used to advertise the product the following year. Connected Claims 2023.

80.    Specifically, Snapsheet promises a 20% reduction in "claims leakage." https://www.snapsheetclaims.com/providers/tpas/

81.    Snapsheet brazenly advertises that its software is designed to reduce loss and reduce the loss ratio:



82.     In doing so, Snapsheet presumes that all insurance companies are overpaying claims by 20% (indemnity leakage).

83.     Snapsheet's promise to reduce claim overpayment to the tune of 20% regardless of the carrier's historic claim values is improper in first party claims.

84.     Today, Snapsheet routinely acknowledges that its claim adjustment software is aimed at reducing the amount of money insurance companies pay to first party claimants by indicating that it will "reduce loss" and claiming a "20% reduction in claims leakage."

85.     State Farm's use of Snapsheet negligently, carelessly and recklessly undervalues first party auto property damage claims because Snapsheet's photo adjustment is incapable of determining damages that are invisible to the naked eye such (e.g., damage to component parts, frame damage and/or malalignment), notably consistent with the directives provided to State Farm adjusters.

## THE FIRST PARTY INSURANCE CLAIM

86.     For decades prior to October 2022, Ms. Vanover was a loyal customer of State Farm who believed State Farm, "like a good neighbor", would be there for her in her time of need.

87.     On or about October 1, 2022, that need arose.  Ms. Vanover and Mr. Lambert were towing their 2014 Keystone Mountaineer RV, VIN # 4YDF34526E4730009 (the "RV") home from their annual vacation at Stonewall Resort.  The annual trips to Stonewall were cherished by Ms. Vanover and Mr. Lambert.  Ms. Vanover and Mr. Lambert stayed in one of Stonewall's campsite lots using their RV.

88.     At all relevant times, the RV was insured through the State Farm Policy. At all relevant times, the Policy's premiums were paid and the Policy was current.

89.    On the way home, the RV struck a pothole in the road.  Mr. Lambert heard a loud crack.

90.    After investigating over the course of the next week, Ms. Vanover and Mr. Lambert believed that the impact from the pothole caused damage to the chassis and tongue assembly of the RV so that it could not support its own weight.

91.    Mr. Lambert reached this conclusion, in part, by slowly lowering the RV as though he were going to transport it.  When the weight of the RV was lowered onto the tongue assembly, the assembly buckled up into the frame of the RV, manifesting in a bowing effect on interior panels.

92.    On October 10, 2022, Ms. Vanover contacted State Farm and made a claim under the State Farm Policy.  During that initial call—as reflected, upon information and belief, in State Farm's claim notes—State Farm understood the damage to be to the "chassis" of the RV.  The State Farm representative who spoke with Ms. Vanover assigned her claim number 4840L814C (the "Claim").

93.    State Farm failed to assign any adjuster to the Claim.

94.    State Farm neglected to photograph or inspect the RV or take any action whatsoever to evaluate the claim in good faith.

95.    It is the duty and responsibility of the insurer to investigate both liability and damages; it is not the duty of the insured to undertake the investigation or incur the cost.

96.    State Farm requested that Ms. Vanover and Mr. Lambert submit photographs of the damage.

97.    The law is well settled that an insurer's duty to investigate is non-delegable.  *See, e.g.*, *Bailey v. Bradford*, 12 F.Supp.3d 826, 842–43 (S.D. W.Va. 2014) (Johnston, J.) (policyholder

"does not have a burden to conduct an investigation of his own claim ... Rather, that burden is on the insurer, and the policyholder need only make a reasonable demand within policy limits during the course of negotiations.").

98.     Stat Farm's attempted to discharge its duty to investigate by requiring the insured to conduct its own investigation.

99.     On October 25, 2022, Ms. Vanover discovered that she had cancer.  Ms. Vanover's doctors moved quickly, surgically removing the tumor on October 26, 2022 and then hospitalizing her from October 31, 2022 to November 1, 2022 to place a port for chemotherapy.

100.    Her oncologist, Dr. Mayez El-Harake, met with Ms. Vanover three times in November 2022 and ordered a PET scan at Raleigh General Hospital on November 22, 2022.

101.    During this time, the only thing State Farm had done is demand that Ms. Vanover— who had other matters of pressing concern—take photos of the RV so that State Farm could evaluate it in lieu of sending a field adjuster to conduct an inspection of the vehicle.

102.    At some point in November or early December 2022, Ms. Vanover spoke with State Farm, which continued to demand photos.

103.    Ms. Vanover explained to State Farm that she did not believe the damage was readily visible such that photographs would allow State Farm to assess the damage properly.

104.    Ms. Vanover specifically requested that State Farm send an adjuster to inspect the vehicle.

105.    State Farm refused to send an adjuster, demanding that Ms. Vanover do that work for them.

106.    As a result, Ms. Vanover took videos and photographs in her best effort to depict the damages and sent them to State Farm sometime between December 1–4, 2022.  On receipt of these photographs, State Farm forwarded the documentation to Snapsheet.

107.    The reason State Farm refused to send an adjuster to properly evaluate a claim where the damage is not readily visible is because State Farm was, upon information and belief, trying to avoid that cost.  Specifically, State Farm wanted photos because it could submit those photos to Snapsheet's AI bot to "assess" the damage via photographs and prepare an "estimate."

108.    As Ms. Vanover predicted, the damage was not visible.  Snapsheet took a single look at the documentation, which showed the bowing of the interior panel due to pressure from a tongue assembly incapable of withstanding the weight of the RV and concluded that the total cost of repairs was a mere $185.50 to "align and repair" the panel with "nails."

109.    On December 6, 2022, Ms. Vanover underwent her first round of chemotherapy.

110.    Ms. Vanover underwent a second round of chemotherapy on December 20, 2022.

111.    Ms. Vanover was hospitalized for plasma and Vitamin K infusions from January 3-4, 2023.

112.    Ms. Vanover had multiple appointments at the Cancer Center from January 5–9, 2023.

113.    Ms. Vanover underwent a third round of chemotherapy on January 10, 2023.

114.    On receipt of the estimate from Snapsheet, Ms. Vanover and Mr. Lambert immediately contacted State Farm to explain what, at that time, they believed to be a simple mistake on the part of State Farm and Snapsheet.

115.    On January 12, 2023, Snapsheet employee "Edwin" noted a telephone call with Plaintiff wherein Snapsheet "[a]dvised her about the SUPP process."

116.    Upon information and belief, this "SUPP" process refers to the process of securing a supplemental estimate.

117.    Upon further information and belief, and given that Plaintiff was advised by State Farm via letter *that same day* of Snapsheet's $185.50 estimate for cosmetic damage, Snapsheet was the entity that first advised Plaintiff of State Farm's policy on supplemental estimate requirement.

118.    In subsequent communications, the State Farm representative informed Ms. Vanover that:

    a.    Snapsheet had generated the estimate;

    b.    that was State Farm's final estimate on the claim as State Farm—despite knowing that the claim was one for damage to the frame and/or structure of the RV—stood by Snapsheet's position;

    c.    State Farm would not send anyone to inspect the RV, because it was a "specialty vehicle" and State Farm lacked anyone qualified to inspect it;

    d.    the only way to change the claim was to secure a supplemental estimate at Ms. Vanover's expense;

    e.    That supplemental estimate would have to be done at a qualified RV repair shop to be considered credible by State Farm, despite the fact that the RV could not be towed;

    f.    Alternatively, State Farm represented—inconsistently—that the RV could be inspected at Ms. Vanover's home by a qualified RV repair person who could generate an estimate for consideration;

    g.    State Farm was not aware of any such qualified mobile RV repair person and had no obligation to assist Ms. Vanover in locating one;

    h.    If Ms. Vanover or Mr. Lambert attempted to tow the RV to said shop, any additional damages that occurred would not be covered by State Farm; and,

    i.    State Farm was not responsible for the cost of towing the RV.

119.    In early May 2023, Ms. Vanover reached out to a lawyer, hoping that someone could engage with State Farm, explain the situation and get everything straightened out.

120.    Ms. Vanover's counsel contacted State Farm via letter on May 9, 2023 to inform of representation.

121.    State Farm did not respond for weeks; as a result, Plaintiff[1] contacted local State Farm agent Chad Preston, who finally told Plaintiff that the State Farm contact was Joyce Thomas.

122.    Plaintiff contacted Ms. Thomas on June 2, 2023 and was told Snapsheet would contact Plaintiff in 3 to 4 days.

123.    Snapsheet did not contact Plaintiff in that time frame.

124.    Plaintiff reached out to Ms. Thomas via e-mail on June 14, 2023.  Via that e-mail, Plaintiff advised that Snapsheet had not contacted Plaintiff, but that Ms. Vanover had photos and video intended to try and depict the damage. Plaintiff further asked that State Farm provide a method to transmit that information. *Id.*

125.    State Farm responded the same day and again informed Plaintiff that Snapsheet estimate constituted an "initial inspection" and "all further inspections will be handled as a supplement."

126.    Plaintiff contacted Ms. Thomas again on June 28, 2023. Plaintiff offered to prepare a letter detailing what the photographs and videos depict and how it relates to the damage. This prompted a call between Ms. Thomas and counsel on July 5, 2023.

127.    During the July 5, 2023 call, Ms. Thomas reiterated the representations made to Ms. Vanover in January 2023, and made several additional representations on State Farm's behalf:

        a.    State Farm has a "duty" to investigate and considers that duty fulfilled with the Snapsheet estimate;

---

[1] From this point forward, communications between Plaintiff and Defendants are through counsel unless otherwise stated.

b.    Ms. Vanover was required to take the RV to an RV facility of her choice, and State Farm refused to send any adjuster or vendor out to consider the damage;

c.    State Farm refused to take any action until Ms. Vanover satisfied these requirements; and,

d.    State Farm and Snapsheet cannot accept videos, and confirmed a desire for Plaintiff to screenshot the videos instead and send more photos.

128.    On July 11, 2023, Plaintiff sent Ms. Thomas a letter explaining the photographs and what they are intended to show because State Farm and/or Snapsheet rejected the video evidence.

129.    This letter prompted a second conversation between Plaintiff and Ms. Thomas on July 24, 2023, during which Ms. Thomas stated she ignored Plaintiff's letter because it was not written by a qualified vendor who repairs RVs.

130.    When asked to define what was meant by a "qualified vendor," Ms. Thomas could not articulate what that meant before declaring that State Farm would simply presume the vendor is qualified, rendering the entire conversation moot.

131.    Finally, Ms. Thomas also declared that a supplemental estimate could ***not*** be based on photos, even though photos were adequate for State Farm's "estimate." This meant that Plaintiff's photos—which Ms. Thomas explicitly requested on July 5, 2023—were not even considered.

132.    This is consistent with State Farm's own communications with Snapsheet. For example, on July 24, 2023, Snapsheet advised State Farm's adjuster on the "supp process" and was advised that State Farm would then "reference to cust." said process. During that phone call, Snapsheet's "Louis" also advised that photos could not be relied upon anymore; the only way to change Snapsheet's estimate was by securing an opinion from a vendor and suggested a mobile RV vendor be used.

133.    This is later confirmed by Snapsheet's "Nora", who explained that Snapsheet refuses to "authorize" repairs off of customer photos, instead only allowing supplementation by a vendor.  Interestingly, "Louis" noted that the "estimate" was not a "full" estimate because a lack of physical inspection.

134.    Operating on State Farm and Snapsheet's representations, and after considerable effort and expense, Ms. Vanover was able to identify RV repair specialist Bill Monaghan, who took pity on Ms. Vanover and Mr. Lambert's circumstances and ongoing cancer treatment.

135.    Mr. Monaghan shut down his RV repair shop and went out to Ms. Vanover's home to conduct an inspection.  Mr. Monaghan's inspection confirmed everything:



| QTY. | DESCRIPTION | PRICE | AMOUNT |
|------|-------------|-------|--------|
|   | Transport fee | | 20,000.00 |
|   | Labor | | 4,000 00 |
|   | welder | | 4,000 00 |
| 3 | Caulk | 11.95 | 35 55 |
|   | metal for bracing | | 200 00 |
|   | shop items | | 1,000 00 |
|   | | | 29,235.55 |
|   | tax | | 1,754.13 |
|   | | | 30,989.68 |

The hitch on the camper is loose has movement in a way it should not. Tells me a weld has been broken seems very unsafe. Hence the high transport fee. The break in weld or metal is in a place under the front cap. We have to remove front cap and possibly the bed room floor to fix then replace after welder is finished.

136.    The total repair cost of $30,989.68 was submitted to State Farm.

137.    On September 11, 2023, State Farm and Snapsheet collaborated on "how they want the claim handled."  Upon information and belief, it was this collaborating / conspiring that led to State Farm's letter of September 15, 2023, which read as follows:

We received the estimate for Mr. Vanovers vehicle, we reached out to the repair facility to request additiaonl photos to suport their estiamte but were advised that the repair facility did not have posession of the vehicle. We need to set up a inspection to secure the photos that are needed for the proper evaluation of the estimate that was submitted for the damages being claimed.  Please call me at your earliest convinience to discuss this  matter and set up the inspeciton.

This demand for an inspection directly contradicts State Farm's prior representation that it lacked the ability to send anyone to inspect the RV.

138.    Three days later, State Farm and/or Snapsheet contacted Ms. Vanover directly to advise it hired "WeGoLook" to inspect the RV in person.

139.    State Farm's position shift undermined State Farm's refusal to do the inspection to begin with, which gave rise to Ms. Vanover's distress and need for assistance.

140.    On September 19, 2023, Snapsheet's Victoria Echevarria, an "Estimator", formally advised State Farm on whether to classify the subject RV as a total loss, explaining the total loss thresholds, asserting that the subject RV did not meet those thresholds, but then acknowledging "$21,000.00 Potential Hidden Damage."

141.    Ultimately, State Farm and Snapsheet decided to declare the Plaintiff's RV a "total loss" apparently foregoing the "needed" inspection.

142.    On September 25, 2023, State Farm declares the vehicle a total loss with a value of $33,346.76.

143.    Nevertheless, State Farm neglects to pay the policyholder undisputed policy proceeds.

144.    Having had enough, Ms. Vanover—once able to secure alternative insurance—demanded that State Farm cancel all of her coverages.

145.    State Farm ignored this letter—documented as being received on February 1, 2024—and continued charging Ms. Vanover premiums.

146.    On February 12, 2024, Plaintiff sends State Farm a letter laying out the required terms for a full agreement on the settlement of Ms. Vanover's property damage claim.

147.    State Farm neglected to respond to the February 12, 2024 letter.

148.    On March 11, 2024, counsel learned State Farm was continuing to charge Ms. Vanover premiums, and demanded that State Farm cease this activity.

149.    Finally, on March 12, 2024, State Farm agreed to the terms of Plaintiff's February 12, 2024 letter.  State Farm subsequently remitted the sum of $33,346.76 to Plaintiff.

150.    Although State Farm attempted—and did, in fact—wrongfully shift the burden of investigation and proof to their insured, Ms. Vanover met the burden.

151.    Ms. Vanover substantially complied with all requirements and policy provisions of the State Farm Policy.  Ms. Vanover promptly, timely, and repeatedly substantiated her claim with documentary evidence of losses to State Farm requesting payment of undisputed policy proceeds by State Farm or payment of her claim.

152.    State Farm knows, and always knew, Ms. Vanover's Claim was covered and policy proceeds are due and owing to the plaintiff under the plaintiff's policy, but State Farm neglected to pay undisputed policy proceeds for months.

153.    To this day, State Farm continues to try and rationalize and justify this delay.

154.    "For purposes of an insured's extracontractual claim, a failure to pay the amount the insured requests is a denial of coverage. Were it otherwise, an insurer could avoid extracontractual liability merely by conceding coverage, paying its insured one dollar, and refusing to pay any more."  *Freeman v. State Farm Mut. Auto. Ins. Co.*, No. C11-761RAJ, 2012 WL 2891167, at *3 (W.D. Wash. July 16, 2012).

155.    State Farm wrongfully and repeatedly denied and/or delayed Ms. Vanover's requests for claim payment as compensation for the loss with substantial encouragement and assistance of Snapsheet.

156.    State Farm repeatedly denied Ms. Vanover's claim and/or unnecessarily prolonged its investigation making protracted disputes necessary to recover sums due and owing under the State Farm Policy.

157.    State Farm chose this course of action despite the fact that Plaintiff advised State Farm that the Claim was righteous.

158.    At all times relevant, including at the time of and prior to filing this lawsuit, State Farm knew it was governed by the common law of first party insurance company claim misconduct, and by the West Virginia Unfair Claim Settlement Practices Act, W. Va. Code § 33-11-4, and the insurance regulations of the State of West Virginia set forth herein, but ignored its obligation to Plaintiff in the handling of Plaintiff's claim for insurance benefits.

159.    As set forth herein, State Farm's claims handling is part of a general business practice and course of conduct, described herein in part, involving multiple violations of West Virginia statutory law and/or West Virginia Insurance Regulations.

160.    State Farm, by and through its agents, servants, officers, adjusters, and employees, violated the West Virginia Unfair Claims Settlement Practices Act, and West Virginia insurance regulations with such frequency as to indicate a general business practice, specifically including not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear and other violations of the Unfair Claims Settlement Practices Act.

161.    As a direct and proximate result of State Farm's bad faith conduct, Ms. Vanover is required to employ the services of an attorney to institute this action to recover the just and proper damages to which she is entitled.

## COUNT I
### (Common Law Claim Misconduct – All Defendants)

162.    Plaintiff repeats and incorporates by reference paragraphs 1–161 of this Complaint as if fully set forth herein.

163.    State Farm's and/or Snapsheet's actions constitute unreasonable delay, wrongful denial of coverage and/or wrongful withholding of payment for the Claim under the State Farm Policy.

164.    State Farm and/or Snapsheet failed to make a fair good-faith investigation of the facts and circumstances surrounding Plaintiff's claim for insurance benefits and refused, for several months, to extend coverage and timely/adequately compensate Plaintiff for her covered claims.

165.    An insurance carrier's responsibilities toward its insured are clearly defined under West Virginia law to include the common law duty of good faith and fair dealing, and that duty is implied in all insurance contracts.

166.    An insurance company breaches the duty of good faith and fair dealing when a policyholder must sue his/her own insurance company and the policyholder substantially prevails in such an action.

167.    An element of the duty of good faith and fair dealing is the obligation of the insurance company to promptly, fairly and reasonably investigate the insured's claim for a loss.

168.    West Virginia law makes clear that "once a first-party insured submits a proof of loss, an insurance carrier has a duty to promptly conduct a reasonable investigation of the policyholder's loss based upon all available information."

169.    It is well-established that the insurance carrier's duty to investigate the claim is non-delegable.

170.    Plaintiff was forced to hire counsel to secure adequate payment under the policy. Specifically, "the attorney's services were necessary to obtain payment of the insurance proceeds." Syllabus Point 1, in part, *Jordan v. National Grange Mut. Ins. Co*., 183 W.Va. 9, 393 S.E.2d 647 (1990).

171.    "Whenever a policyholder substantially prevails in a property damage suit against its insurer, the insurer is liable for: (1) the insured's reasonable attorneys' fees in vindicating its claim; (2) the insured's damages for net economic loss caused by the delay in settlement, and [(3)] damages for aggravation and inconvenience." Syllabus Point 1, *Hayseeds, Inc. v. State Farm Fire & Casualty Co*., 177 W.Va. 323, 352 S.E.2d 73 (1986).

172.    The policy behind the line of *Hayseeds* cases is "that a policyholder buys an insurance contract for peace of mind and security, not financial gain, and certainly not to be embroiled in litigation. The goal is for all policyholders to get the benefit of their contractual bargain: they should get their policy proceeds promptly without having to pay litigation fees to vindicate their rights." *Miller v. Fluharty*, 201 W.Va. 685, 696 500 S.E.2d 310, 321 (1997). As such, the West Virginia Supreme Court has provided that,

> An insurance carrier has a duty, once a first-party policyholder has submitted proof of a loss, to promptly conduct a reasonable investigation of the policyholder's loss based upon all available information. On the basis of that investigation, if liability to the policyholder has become reasonably clear, the insurance carrier must make a prompt, fair and equitable settlement offer. If the circuit

court finds evidence that the insurance carrier has failed to properly or promptly investigate the policyholder's claim, then the circuit court may consider that evidence in determining whether the policyholder has substantially prevailed in an action to enforce the insurance contract.

173.    "When examining whether a policyholder has substantially prevailed against an insurance carrier, a court should look at the negotiations as a whole from the time of the insured event to the final payment of the insurance proceeds. If the policyholder makes a reasonable demand during the course of the negotiations, within policy limits, the insurance carrier must either meet that demand, or promptly respond to the policyholder with a statement why such a demand is not supported by the available information." Syllabus Point 4, in part, *Miller*, 201 W. Va. at 685, 500 S.E.2d at 310.

174.    Defendants intentionally, knowingly and/or negligently failed to promptly pay the insured's claim in response to a reasonable demand during the course of negotiations, within policy limits.

175.    This conclusion is further supported by the provisions of W. Va. C.S.R. § 114–14–6.7, which provides, as pertinent here, both that a prompt investigation is 30 days and that if an investigation remains incomplete, an insurer shall provide written notification of the delay to the claimant every 45 calendar days thereafter until the investigation is complete. See *Allen*, 2011 WL 5357632 at *6 (noting that the "West Virginia Code of State Rules considers a prompt investigation to be thirty (30) days"). These rules are consistent with the public policy determinations that place a burden on an insurer to conduct a prompt investigation of a policyholder's claim. See generally *Miller*, 500 S.E.2d at 319–20.

176.    "[T]he West Virginia Supreme Court of Appeals has stated that a plaintiff "substantially prevails in a property damage action" when the action is settled "prior to the

commencement of the action." *Mid-State Auto., Inc. v. Harco Nat'l Ins. Co*., 2019 WL 6130457, at * 2 (S.D. W. Va. Nov. 18, 2019) (*citing Jordan*, 393 S.E.2d at 652).

177.    In this case, the plaintiff was forced to retain undersigned counsel to secure money due and owing under the policy of insurance.

178.    For reasons set forth hereinabove, State Farm with the substantial encouragement and assistance of Snapsheet attempted to underpay the plaintiff's claim, shift the burden and expense of investigation onto the plaintiff, offered amounts substantially lower than the true amount of the claim, treated the plaintiff as an adversary, refused to tender undisputed policy proceeds in conformity with State Farm's internal policy and procedure and engaged in other wrongful conduct requiring the plaintiff to file the instant lawsuit.

179.    Ultimately, State Farm did not work to evaluate Plaintiff's claim; instead, it ignored the nature of the claim, generated a facially absurd "estimate" and then refused to act until Ms. Vanover paid out of her own pocket for a real estimate.

180.    Even after the plaintiff's counsel persuaded State Farm to reconsider its facially absurd valuation and State Farm re-evaluated the claim at $33,346.76, State Farm neglected to tender the undisputed policy proceeds.

181.    Finally, State Farm accepted Plaintiff's terms and conditions on March 12, 2024.

182.    As a direct and proximate result of the acts alleged in this count of the Complaint, Plaintiff was damaged and injured as is set forth herein.

## COUNT II
### (Unfair Claims Settlement Practice Act – All Defendants)

183.    Plaintiff repeats and incorporates by reference paragraphs 1–182 of this Complaint as if fully set forth herein.

184.    Plaintiff, individually and by counsel, repeatedly demanded insurance benefits owed to her by State Farm.

185.    Prior to this lawsuit being filed, Plaintiff advised State Farm that the claim for insurance benefits was covered under the State Farm insurance policy and the damages were due and owing under Plaintiff's policy of insurance.

186.    Plaintiff made numerous demands and was wrongfully denied, for months, insurance benefits despite State Farm having actual knowledge that policy proceeds were owed to her.

187.    Prior to this lawsuit being filed, State Farm and/or Snapsheet repeatedly denied Plaintiff's reasonable requests for benefits under the State Farm Policy and made misrepresentations regarding State Farm's ability to investigate the loss, inspect the RV and the use of its Snapsheet estimating tool.

188.    As a direct and proximate result of the acts of Defendants, by and through their agent(s), employee(s) and/or representative(s) in refusing to cover and failing to pay Plaintiff's claim for policy proceeds, Plaintiff was required to employ the services of attorneys to ultimately institute litigation in connection with recovering the just and proper compensation as a result of the loss described hereinabove.

189.    Shortly after the Claim was made, and before the filing of this lawsuit, Defendants knew that Plaintiff's claim for insurance benefits was righteous and that it owed payment under the State Farm Policy and that the claim had a value far in excess of State Farm's initial low-ball offer via the Snapsheet estimate.

190.    Plaintiff was forced to file this lawsuit because of the acts and omissions of Defendants, including but not limited to:

a.    failure to conduct a prompt and reasonable investigation;

b.    attempting to coerce the plaintiff into accepting an unjust settlement;

c.    attempting to take advantage of an insured who was suffering from cancer;

d.    unreasonably refusing to acknowledge that State Farm was liable for the full value of Plaintiff's claim for benefits;

e.    failing to negotiate in good faith;

f.    unreasonably refusing to acknowledge pertinent communications;

g.    not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

h.    failure to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

i.    failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

j.    refusing to pay claims without conducting a reasonable investigation based upon all available information;

k.    failing to promptly provide a reasonable explanation of the basis in the State Farm Policy in relation to the facts or applicable law for the offer of a compromise settlement;

l.    failure to conduct a meaningful investigation of the facts and circumstances of the claim prior to denying coverage;

m.    failing to promptly adjust and pay the covered damages and losses sustained by Plaintiff, which damages and losses were covered by the State Farm Policy;

n.    failing to deal with plaintiffs in a good faith manner; and/or,

o.    other acts and omissions by State Farm.

191.    W. Va. Code § 33-11-4(9) prohibits unfair claim settlement practices.

192.    Defendants and their agents, servants, officers, adjusters, and employees violated

the West Virginia Unfair Claims Settlement Practices Act, West Virginia Code § 33-11-4(9), the

Unfair Trade Practices Act, as well as the insurance regulations promulgated thereunder, including, but not limited to, the following:

    a.    Failed to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

    b.    Failed in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

    c.    Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

    d.    Refusing to pay claims without conducting a reasonable investigation based upon all available information;

    e.    Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds, when such insureds have made claims for amounts reasonably similar to the amounts ultimately recovered;

    f.    Attempting to starve Plaintiff into an unjust settlement;

    g.    Failing to negotiate in good faith;

    h.    Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

    i.    Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; and/or

    j.    other acts and omissions.

193.    Plaintiff's request for insurance benefits under the State Farm Policy were systematically denied by State Farm, which was substantially encouraged and assisted by Snapsheet, and Plaintiff was forced to retain counsel in order to recover the full amount of her damages as she is entitled to under the law.

194.    To establish a cause of action under § 33–11–4(9), a plaintiff "must demonstrate that the insurer (1) violated the UTPA in the handling of the claimant's claim and (2) that the

insurer committed violations of the UTPA with such frequency as to indicate a general business practice." *Holloman v. Nationwide Mut. Ins. Co*., 617 S.E.2d 816, 823 (W. Va. 2005).

195.    "[E]ven though W.Va. Code § 33–11–4(9) requires more than a single isolated violation in order to show a general business practice, a claimant may produce sufficient evidence of this in a single claim." *Elmore v. State Farm Mut. Auto. Ins. Co*., 504 S.E.2d 893, 902 (W. Va. 1998). See *Dodrill v. Nationwide Mut. Ins. Co*., 491 S.E.2d 1, 12–13 (W. Va. 1997) ("separate, discrete acts or omissions, each of which constitute violations of different sub-paragraphs of W. Va. Code § 33–11–4(9), may indeed demonstrate a 'general business practice' in the handling of a single claim, the focus of which would tend to show frequent and rather general disregard for the several proscriptions separately set out in the relevant statute.").

196.    "The [West Virginia] Supreme Court of Appeals has explained 'that the reasonableness of an insurance company's conduct [under the WVUTPA] "ordinarily is a question of fact for the jury" that should not be determined as a matter of law by a trial court.'" *White v. Am. Gen. Life Ins. Co*., 651 F. Supp. 2d 530, 547–48 (S.D.W. Va. 2009) (quoting *Hicks ex rel. Saus v. Jones*, 617 S.E.2d 457, 465 (W. Va. 2005)).

197.    Defendants violated W. Va. Code § 33-11-4(9)(b) by failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies insofar as (1) Defendants refused to undertake an independent investigation of the loss, (2) shifted the burden of investigation onto the plaintiff, (3) refused to inspect and photograph the vehicle in response to the Plaintiff's requests, (4) ignored the plaintiff's representation that photographs could not capture the damage to the property insofar as the damage was not readily visible, (5) insisted upon using AI software that could not fully and completely value the loss insofar as the damage was not readily apparent from photographs; (6) refused to accept video

evidence, (7) demanded evidence from a "qualified vendor" but could not articulate what constitutes a qualified vendor, (8) refused to permit a supplemental estimate based upon photographs, (9) ignoring the photographs sent on July 5, 2023 and ignoring plaintiff's July 11, 2023 letter because it was not from a "qualified vendor;" and (10) otherwise generally failed to act reasonably promptly upon the plaintiff's communications regarding the subject claim.

198.    Defendants violated W. Va. Code § 33-11-4(9)(c) insofar as it failed to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies insofar as the defendants: (1) ignored well settled West Virginia law that the burden of investigation is on the insurer; (2) shifted the burden of investigation to the claimant; (3) demanded that its policyholder submit photographs evidence of the loss rather than sending a field adjuster to inspect the loss; (4) refused to evaluate video evidence; (5) demanded an estimate from a "qualified vendor" when it could not define what constitutes a qualified vendor; (6) used Snapsheet's AI estimation software when it was generally defective and/or improper under the circumstances; (7) ignored the nature of the claim (8) generated a facially absurd "estimate;" (9) refused to reconsider its absurd estimate until the policyholder paid out of her own pocket for a real estimate; (10) refused to tender undisputed policy proceeds as directed by State Farm's First Party Coverage Seminar training materials; and (11) instituted an arbitrary "SUPP" process for supplemental estimates that would not consider supplemental photographic evidence and/or video evidence in consideration of a claim.

199.    Defendants violated W. Va. Code § 33-11-4(9)(d) by refusing to pay claims without conducting a reasonable investigation based upon all available information insofar as the defendants engaged in a one-sided investigation that deliberately ignored evidence and controlling

law that requires State Farm to conduct a reasonable investigation and to refrain from any effort to shift the burden and cost of investigation on the policyholder.

200.    The specific wrongful acts in violation of §33-11-4(9)(d) include but are not necessarily limited to: (1) ignoring well settled West Virginia law that the burden of investigation is on the insurer; (2) shifting the burden of investigation to the claimant; (3) demanding that its policyholder submit photographs evidence of the loss rather than sending a field adjuster to inspect the loss; (4) refusing to evaluate video evidence; (5) demanding an estimate from a "qualified vendor" when it could not define what constitutes a qualified vendor; (6) using Snapsheet's AI estimation software when it was generally defective and/or improper under the circumstances; (7) ignoring the nature of the claim (8) generating a facially absurd "estimate;" and (9) refusing to reconsider its absurd estimate until the policyholder paid out of her own pocket for a real estimate

201.    Defendants violated W. Va. Code § 33-11-4(9)(f) by not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear insofar as State Farm knew, based upon historical data, that Snapsheet was producing estimates that were unreasonably low in an effort to reduce severity, but nevertheless deliberately utilized Snapsheet to value first party auto property claims in an effort to reduce claim payment and increase State Farm's corporate wealth.

202.    Defendants violated W. Va. Code § 33-11-4(9)(g) by compelling their insureds to institute litigation to recover amounts due under an insurance policy insofar as defendant State Farm neglected to tender undisputed policy proceeds in accordance with State Farm's internal policies and procedures as outlined in State Farm's First Party Coverage Seminar.

203.    The plaintiff has alleged "separate, discrete acts or omissions, each of which constitute violations of different sub-paragraphs of W. Va. Code § 33–11–4(9)." *Dodrill*, 491 S.E.2d at 12–13.

204.    Defendants, by and through their agents, servants, officers, adjusters, and employees committed violations of the West Virginia Unfair Claims Settlement Practices Act and West Virginia insurance regulations with such frequency as to indicate a general business practice.

205.    As a direct and proximate result of the acts alleged in this count of the Complaint, the Plaintiff was damaged and injured as is hereinafter set forth.

### COUNT III
### (Breach of Contract – State Farm)

206.    Plaintiff repeats and incorporates by reference paragraphs 1–205 of this Complaint as if fully set forth herein.

207.    Plaintiff paid State Farm valuable consideration for insurance coverage in the form of insurance premiums.

208.    In consideration of said premiums, State Farm issued Plaintiff the State Farm Policy.

209.    The State Farm Policy constitutes a contract for insurance coverage which was in effect on and about October 1, 2022.

210.    In addition, the State Farm Policy includes an implied covenant of good faith and fair dealing, which State Farm has breached through the conduct set forth herein.

211.    On or about October 1, 2022, Plaintiff suffered a covered loss, as that term is defined, under the State Farm Policy.

212.    Plaintiff complied with all terms and conditions of the State Farm Policy.

213.    State Farm failed to timely provide the full value of the insurance coverage that it contracted for with Plaintiff and is, therefore, in breach of the State Farm Policy.

214.    In addition, State Farm has breached the State Farm Policy as follows:

a.    failure to conduct a prompt and reasonable investigation;

b.    attempting to coerce the plaintiff into accepting an unjust settlement;

c.    attempting to take advantage of an insured who was suffering from cancer;

d.    unreasonably refusing to acknowledge that State Farm was liable for the full value of Plaintiff's claim for benefits;

e.    failing to negotiate in good faith;

f.    unreasonably refusing to acknowledge pertinent communications;

g.    not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

h.    failure to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

i.    failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

j.    refusing to pay claims without conducting a reasonable investigation based upon all available information;

k.    failing to promptly provide a reasonable explanation of the basis in the State Farm Policy in relation to the facts or applicable law for the offer of a compromise settlement;

l.    failure to conduct a meaningful investigation of the facts and circumstances of the claim prior to denying coverage;

m.    failing to promptly adjust and pay the covered damages and losses sustained by Plaintiff, which damages and losses were covered by the State Farm Policy;

n.    failing to deal with plaintiffs in a good faith manner; and/or

o.    other acts and omissions by State Farm.

215.    In addition, State Farm breached the covenant of good faith and fair dealing by putting its own interests before the interests of its policyholders.

216.    As a direct and proximate result of the acts alleged in this count of the Complaint, Plaintiff was damaged and injured as set forth herein.

## COUNT IV
## (Tortious Interference with a Contractual Relationship – Snapsheet)

217.    Plaintiff repeats and incorporates by reference paragraphs 1–216 of this Complaint as if fully set forth herein.

218.    One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

219.    Defendant Snapsheet intentionally and improperly interfered with the performance of Plaintiff's insurance contract with State Farm by providing State Farm a product that deliberately undervalues first party property estimates.

220.    The contract between Plaintiff and State Farm was valid and binding at the time of the loss.

221.    Snapsheet is not a party to the Plaintiff's contract of insurance.

222.    Snapsheet's estimate actually induced or otherwise caused State Farm not to perform the contract for reasons set forth hereinabove.

223.    Snapsheet's intentional interference is documented hereinabove insofar as Snapsheet advertised that it would reduce loss, reduce severity, and reduce the loss ratio without regard for the historical value of State Farm's first party automobile claims.

224.    Snapsheet cannot show that its interference was proper under West Virginia law by justification, privilege or affirmative defenses insofar as they cannot show legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper.

225.    As a direct and proximate result of the acts alleged in this count of the Complaint, Plaintiff was damaged and injured as set forth herein.

## COUNT V
### (Constructive Fraud – All Defendants)

226.    Plaintiff repeats and incorporates by reference paragraphs 1–225 of this Complaint as if fully set forth herein.

227.    Constructive Fraud is a breach of legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests.

228.    Defendants State Farm and Snapsheet engaged in constructive fraud by requiring Plaintiff to submit photographs of damage to her vehicle when State Farm and Snapsheet knew, or should have known, that Snapsheet's AI software was incapable of providing accurate estimates of damage that was not readily apparent from photographs and/or visible to the naked eye (i.e., damage to component parts, frame damage, etc.).

229.    The Northern District of West Virginia has previously recognized that a constructive fraud claim could be asserted based upon "West Virginia's public policy prohibiting insurers from taking unfair advantage of policy holders." *Artworks, LLC v. Hartford Cas. Ins. Co.*,

2020 WL 2754918, at *3 (N.D. W. Va. May 27, 2020) (finding plaintiffs could possibly establish a cause of action for constructive fraud against insurer defendant).

230.    West Virginia has "a substantial public policy prohibiting insurers from deceiving, oppressing, and/or taking unfair advantage of policy holders."

231.    This public policy stems from West Virginia case law, legislative enactments, and insurance commissioner rules and regulations.

232.    Defendants' use of Snapsheet AI software generally and/or under the specific circumstances of the instant claim breaches their legal or equitable duties to Plaintiff and constitutes constructive fraud.

233.    Defendants had actual notice from plaintiff Vanover that the damage to her vehicle was not readily apparent to the naked eye and could not be captured by photographs.

234.    Defendants knew that Snapsheet software would not provide a full and complete estimate of the damage to Ms. Vanover's RV but persisted in utilizing Snapsheet in an effort to reduce State Farm's loss ratio and/or increase State Farm's corporate wealth.

235.    As a direct and proximate result of the acts alleged in this count of the Complaint, Plaintiff was damaged and injured as set forth herein.

**COUNT VI**
**(Civil Conspiracy, Substantially Encourage and Assist, Joint Venture – All Defendants)**

236.    Plaintiff repeats and incorporates by reference paragraphs 1–235 of this Complaint as if fully set forth herein.

237.    State Farm and Snapsheet, by and through their concerted action described hereinabove, sought to accomplish an unlawful purpose and/or to accomplish some purpose, not in itself unlawful, by unlawful means.

238.    Specifically, State Farm and Snapsheet conspired to unlawfully reduce first party claim payment in violation of West Virginia insurance law to increase State Farm's corporate profit.  In turn, State Farm's increase in corporate profit inures to Snapsheet's benefit as an investment of State Farm and a vendor thereto.

239.    Defendants' wrongful acts causing injury to Plaintiff create a civil conspiracy prohibited by law.

240.    While civil conspiracy is not, *per se*, a stand-alone cause of action; it is a legal doctrine under which liability for the tortious conduct of State Farm may be imposed on Snapsheet, regardless of whether Snapsheet did not actually commit the hereinabove violations of West Virginia insurance itself insofar as Snapsheet shared a common plan for the commission of unfair claim settlement practices, unfair trade practices and insurance bad faith with State Farm.

241.    For example, Snapsheet brazenly advertises that its software is designed to reduce loss and reduce the loss ratio.

242.    Snapsheet advertised its offer and thereafter deliberately undervalued first party insurance losses for State Farm, including the plaintiff's loss, with the intent to increase State Farm's corporate profit at the expense of its policyholder.

243.    Based upon information and belief, State Farm's decision to hire Snapsheet and utilize its product was based in whole or in part upon Snapsheet's representation that it would reduce State Farm's loss ratio.

244.    The defendants formulated and engaged in a program to outsource first party automobile claim estimation by utilizing Snapsheet's AI software when the software was designed to undervalue claims to enrich State Farm by only valuing loss that is visible to the naked eye

(ignoring losses like damage to internal component parts, frame damage, etc.) in an effort to enrich State Farm at the expense of policyholders, including the plaintiff.

245.    Snapsheet substantially encouraged and assisted State Farm in its efforts to reduce first party claim payment to increase corporate profit.

246.    Snapsheet acted in concert with State Farm pursuant to a common design or plan.

247.    Snapsheet's advice and/or encouragement to State Farm regarding the value of the Claim gave support to State Farm's illegal conduct when Snapsheet knew the conduct was illegal.

248.    Snapsheet's advice and/or encouragement was a substantial factor in causing the tortious conduct of State Farm.

249.    Snapsheet was aware that the aim of using its software was to reduce claim payment and increase corporate wealth, not properly evaluating the first party insurance claim.

250.    Defendants engaged in a joint venture and/or an association of two or more entities to carry out a single business enterprise for profit, for which purpose they combined their property, money, effects, skill, and knowledge.

251.    Plaintiff maintains that Snapsheet and State Farm have combined their property, money effects, skill and knowledge to assist one another in the adjustment of property loss claims.

252.    Specifically, State Farm has employed Snapsheet's AI bot to automate property loss adjustments for the purpose of lowering claim payment thereby lowering the loss reserve and increasing corporate revenue.

253.     State Farm is so heavily intertwined with Snapsheet it has invested its own money through a subsidiary corporation (State Farm Ventures, LLC) in the Snapsheet AI corporation.

254.    Further evidence which militates in favor of a finding of joint venture is that Scott Topper , Global Vice President of Customer Solutions, Sean Gergets , Director of Estimating and

Steve Hawes , Director of Estimating QA, each publicly represents and advertises Snapsheet's relationship with insurers as a "partnership."

255.    As a direct and proximate result of the acts alleged in this count of the Complaint, Plaintiff was damaged and injured as set forth herein.

## DAMAGES

256.    Plaintiff repeats and incorporates by reference paragraphs 1–255 of this Complaint as if fully set forth herein.

257.    Some or all of Defendants' acts as alleged hereinabove in each paragraph and/or each count of this Complaint were willful, wanton, and malicious and/or reckless and/or in reckless disregard for the civil rights of their insureds.

258.    Defendants knew or should have known that Plaintiff's claim was righteous but knowingly refused to properly adjust the total loss and willfully, maliciously and intentionally undervalued the claim to increase State Farm's corporate revenue.

259.    As a direct and proximate result of Defendants' conduct, as alleged in this Complaint, Plaintiff has suffered the following compensable losses:

    a.    Psychological trauma, harm to physical health, anxiety, inconvenience, emotional distress, anger, anguish, depression, disappointment, embarrassment, fear, fright, grief, horror, loss of use of insurance benefits and/or humiliation;

    b.    Unnecessary costs and expenses;

    c.    Cost and stress of retaining counsel to recover benefits from State Farm to which she was entitled;

    d.    Attorneys' fees;

    e.    Insurance benefits wrongfully withheld;

    f.    Economic losses; and,

    g.    Other injuries, damages and losses.

**WHEREFORE**, Plaintiff Terry Vanover demands judgment against Defendants State Farm Mutual Automobile Insurance Company and Bodyshopbids, Inc., d/b/a Snapsheet, Inc. for the following:

      a.    compensatory damages to which they are entitled to for the wrongs alleged in the various paragraphs and counts of this Complaint in an amount in excess of the jurisdictional limits of this Court;

      b.    punitive damages in an amount that will punish the Defendants, and deter the Defendants from committing this type of conduct in the State of West Virginia in the future, and by setting an example, deter other insurers from committing this type of conduct in the State of West Virginia in the future and in such amount as will satisfy all other reasons of law and public policy for an award of punitive or exemplary damages;

      c.    attorney fees;

      d.    pre-judgment interest;

      e.    post-judgment interest;

      f.    costs; and,

      g.    such other relief as the Court or jury deems just.

The minimum jurisdictional amount for filing this action has been satisfied.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

**TERRY VANOVER,**

**By Counsel,**

__/s/   *David A. Bosak*_____
David A. Bosak (WV State Bar # 11947)
**BAILEY JAVINS & CARTER LC**
213 Hale Street
Charleston, West Virginia 25301
Telephone: (304) 345-0346
Facsimile: (304) 345-0375
dbosak@bjc4u.com

/s__*George N. Sidiropolis*_____

George N. Sidiropolis, Esq. (WV State Bar # 10391)
**FLANIGAN LEGAL, PLLC**
1140 Main Street, 4th Floor
Wheeling, WV 26003
Phone: (304) 233-7766
george@flaniganlegal.com