IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

_____

TERRY VANOVER,

      Plaintiff,

  v.                       Civil Action No.:

STATE FARM MUTUAL AUTOMOBILE     5:23-cv-00802

INSURANCE COMPANY and

BODYSHOPBIDS, INC., d/b/a

SNAPSHEET, INC.,

      Defendants.

_____

VIDEOTAPED DEPOSITION 30(b)(6)

_____

WITNESS:             JUSTIN PLATT

DATE:                Monday, February 24, 2025

START TIME:        11:06 a.m., ET

END TIME:          8:11 p.m., ET

REMOTE LOCATION:    Remote Legal platform

PROCEEDINGS OFFICER:  Fanya Cantave

JOB NO.:          33922

A P P E A R A N C E S


FLANIGAN LEGAL, PLLC

1140 Main Street

Fourth Floor

Wheeling, West Virginia 26003

By:  KIMBALL JONES, ESQUIRE

     kimball@bighornlaw.com

     GEORGE N. SIDIROPOLIS, ESQUIRE

     george@flaniganlegal.com

Appearing for Plaintiff


DINSMORE & SHOHL, LLP

215 Don Knotts Boulevard

Suite 310

Morgantown, West Virginia 26501

By:  JILL C. RICE, ESQUIRE

     jill.rice@dinsmore.com

     LAUREN E. MOTES, ESQUIRE

     lauren.motes@dinsmore.com

Appearing for Defendant, State Farm Mutual

Automobile Insurance Company

A P P E A R A N C E S (Continued)

DICKIE, MCCAMEY & CHILCOTE, L.C.

2001 Main Street

Suite 501

Wheeling, West Virginia 26003

By:  MICHELLE D. BALDWIN, ESQUIRE

mbaldwin@dmclaw.com

Appearing for Defendant, BodyShopBids, Inc., d/b/a

Snapsheet, Inc.

I N D E X  O F  T E S T I M O N Y

EXAMINATION OF JUSTIN PLATT:                          PAGE

By Mr. Jones                                          10

INDEX OF EXHIBITS

(available for download)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Amended Notice of Taking Deposition | 36 |
| 2 | West Virginia Code Section 33-11-4 | 107 |
| 3 | First Party Coverage Seminar Nov. 2002 | 179 |
| 4 | Our Commitment to Our Policyholders 1 | 209 |
| 5 | Claim File 1 | 218 |
| 6 | Note showing a call with Terry and Donald | 246 |
| 7 | Letter that State Farm sent to Terry | 265 |
| 8 | Email from Joyce to Bosak, July 5, 2023 | 289 |
| 9 | Claim File 2 | 317 |
| 10 | Total loss settlement tool summary | 342 |
| 11 | Article - Document Retention Methods | 348 |
| 12 | Document Binder | 354 |
| 13 | Letter from Lauren to George | 357 |

                    I N D E X   O F   R E Q U E S T S


DESCRIPTION                                        PAGE    LINE

Request for Witness to go back and verify          332      22

whether or not there were actual

communications that can be produced in a

verifiable way showing that photographs

were actually provided by State Farm to

Snapsheet.

separate to that, separate to the calls themselves, did you do any additional preparation on your own, reading materials or anything like that?

A    Not very much.  The majority of my review I did when I reviewed Ms. Vanover's claim file, that was on my own.  And I would -- I did review some of the materials after the calls just to remind myself of that discussion.  But I did not do very much on my own.

Q    Okay.  And who are the people that you met with during those various calls?

A    So again, this would be an estimator to remember all of the areas, but I'll try to walk them as best I can.  I met with the claim handlers that were -- that would handle the first line of work.  Met with total loss team manager, who would have also been involved in some of the work from Ms. Vanover's claim. I met with claims consultant.

I met with several of our partners that work with Snapsheet, whether it be Vendor Management or managers that are involved with reinspection of Snapsheet's estimates, individuals that played a part in the initial test with Snapsheet.  I also met with Actuary.  I'm trying to think if there's anyone I've missed.  I can't say that's an all-inclusive list, but that -- it seems like we're getting close if I -- can't

think of anyone else that we met with.

Q   Okay.

A   I may --

Q   Let me -- oh, sorry.

A   I said I may be missing someone or an area. If -- if I do, I -- I'll try and (indiscernible).

Q   Okay.  Let me -- let me make -- let me just walk through some of those people.  So did you -- did you say that you met with the adjuster that was the primary handler of the claim?

A   I remember the claims adjuster who does a similar -- who does that role.  I did not meet with the claims adjuster who investigated that claim.  I met with the claims adjuster that is now has ownership of that claim, who does that role.

Q   Okay.  And the claims adjuster that did -- that was on the claim, is she no longer on this particular -- is she no longer with State Farm?

A   It's my understanding that she is still with State Farm.

Q   Okay.  Do you know -- do you know why you didn't meet with the specific claims adjuster that handled the claim?

A   I -- I don't know why.

Q   Okay.  You mentioned -- I think you said that

you also met with the supervisor or the manager.  Did I say that correctly?

A   Yes.  I met with one of the managers in Total Loss.

Q   Got it.  Was this a manager that was directly involved with the handling of this claim or overseeing the handling of this claim?

A   There were -- I -- I think there were a couple of total loss team managers.  I don't recall if she would -- if she had individual handling, but she would also be -- she would handle these similar types of claims.

Q   Got it.  Okay.  Is -- and I don't want to -- I can accidentally at times restate something, and I say it differently.  And so if I ever do that, I'm never trying to put words in your mouth.  So if you can correct me if I do that.  The -- it -- did you -- it sounds like you did not speak with the actual manager that would have been supervising the work of the adjuster from this particular claim, but you did speak with a manager who would have supervised the work of adjusters on this exact same type of claim.  Did I understand you correctly?

A   Whether or not she had handling in this claim, because, again, she -- her name -- she did not have file

notes in this claim.  So whether or not she received this claim or she had a handler that performed work on this claim at some point, I couldn't speak to, but your other statement was correct in that she would handle this -- this type of work.

Q    Understood.  Understood.  So you can't say for sure whether or not she would have been asked a question about this claim or something along the way, but you do know that she didn't have any notes within the file indicating a direct presence in the claim; is that fair?

A    Not -- not pre-suit.  I think she had some handling after suit was filed.  So you will see notes in -- with -- from her.  But it's my understanding any of her handling was -- was post-suit.

Q    Okay.  Perfect.  Okay.  Thank you.  You mentioned that you met with a consultant?  Can you tell me about who is that consultant, and what's -- yeah.

A    Yeah.  So I -- I met with a claim consultant. And he -- he's over auto claims for the West Virginia jurisdiction, which auto claims it would include RV claims similar to Ms. Vanover's.

Q    And when you say "a claims consultant," is that a, like, a person that isn't an employee of State Farm and works in a different capacity?

A    No.  He -- he is -- he is an employee for

State Farm.

Q   I see.  And so it's -- he's an employee of State Farm, and his title is a consultant?

A   Yes.

Q   Okay.  Got it.  And I apologize.  Can you, kind of, explain to me where in the hierarchy a consultant over RV claims, where would they fit into, kind of, the structure within State Farm?

A   And I -- again, to answer that question, this is going to be an estimate because, again, as far as hierarchy goes.  But he would be responsible for -- so let's say if I'm a team manager, my -- my direct -- I'm -- I'm a direct report for section manager, my section manager could reach out to our claim consultants for questions regarding claims and things like that.

Q   Got it.  Okay.  And so is this a person who previously likely would have been an adjuster, supervisor at some point, and now they're, kind of, a specialist?

A   I don't know.  I'm not -- I'm -- I'm not familiar with his background.

Q   Okay.  All right.  In any case, this is a person that -- does he directly handle RV claims or does he just -- people reach out to him for guidance on how to handle RV claims?

A    It would -- it would -- the option be there. And it sounds -- because he does -- he would not have direct reports that handle RV claims.

Q    Got it.  Okay.  And so when these -- when these types of claims come up, he's, kind of, the person people would go to to get some direction or advice on handling?

A    Potentially.  I think his role varies.  And so in -- in a lot of -- most cases to handle a claim you would not require the need of a consultant, but he was leveraged because of -- because of the suit, because in preparation for the deposition, because some of the questions and the way they were worded to see if he had knowledge of some of the topics in this -- in this claim or in this suit.

Q    Okay.  All right.  Okay.  Thank you.  You mentioned some people at -- I think you said there were some people you spoke to at State Farm that were involved in the process of working with Snapsheet; is that correct?

A    That's correct.

Q    Can you walk me through who those people were again?

A    Yes.  And I -- actually, I -- I have a summary here I'm going to use real quick if you don't mind.  And

anyone else that's on here, I didn't say this in the admonitions, but this is not a marathon, and we can take a break at any point that anybody feels to take a break. Just let me know. If I have a pending question that you haven't answered yet, then you need to answer that question first before we take a break, or even sometimes when there's, kind of, a line of questions we need to get through, but I'm not going to be hardcore on that stuff. So if anybody needs a break at some point, just let me know, and we'll go ahead and take a break. Okay?

THE WITNESS: Fair enough.

BY MR. JONES:

Q    And is it your understanding, Justin, that State Farm -- that you are -- that State Farm's attorneys are your attorneys related to this deposition?

A    That's correct. My attorney and -- and for State Farm.

Q    Got it. The -- one question. You mentioned earlier that there was a consultant that you spoke to. Who was that consultant --

A    Kevin Roman.

Q    -- that you spoke to? I apologize. Say it again?

A    Kevin Roman.

Q    How do you spell the last name?

A    R-O-M-A-N.

Q    Okay.  So when it comes to the divisions that State Farm has that deal with claims handling, there end up being a variety of divisions that are involved in that, correct?

A    That's correct.

Q    And when a person, for example, such as Ms. Vanover, is purchasing an insurance policy with State Farm, she has a variety of options in terms of the types of coverage that she's going to be purchasing, correct?

A    That is -- that's my understanding.  That is correct.

Q    And you know that this -- some --

A    As a --

Q    -- of this stuff is common -- oh, I apologize. Go ahead.

A    And that's -- yeah.  As a consumer, that's -- I mean, I -- that's --

Q    Right.  As a consumer, 27 years working for State Farm, you understand how insurance works, right?

A    Correct.

Q    Okay.  And so sometimes, as I'm asking questions, I'm going to try to ask questions in a way that is, kind of, commonsensical, because otherwise some of the very technical stuff doesn't always make a ton of